519 S.E.2d 257 (1999)
238 Ga. App. 491
In the Interest of D.L.T. et al., children.
No. A99A0617.
Court of Appeals of Georgia.
June 9, 1999.
David J. Farnham, for appellant.
Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Stephanie B. Hope, Assistant Attorneys General, John R. Laseter, for appellee.
BARNES, Judge.
Claiming insufficient evidence, Donald Tucker appeals the termination of his parental rights to his three minor children, D.L.T., C.D.T., and T.D.T. Because the trial court was authorized to find that there was clear and convincing evidence in favor of termination, we affirm.
The record shows that when Tucker's parental rights were terminated by the Walton County Juvenile Court on July 14, 1998, D.L.T. was eight years old, C.D.T. was seven *258 years old, and T.D.T. was five years old. The children's mother, Margaret Diane Tucker, surrendered her rights to the children on March 16, 1998, four months earlier.
Walton County's Department of Family & Children's Services ("DFACS") was not the first to intervene and monitor the care the Tuckers provided to their children. The record shows that Clayton County's DFACS became involved in 1990 until the parents moved to Rockdale County in 1995. At that time, Rockdale County's DFACS took over until the parents moved to Walton County in 1996.
In July 1990, Clayton County received two reports that the oldest child, who was one year old, was not receiving proper care. Specifically, the trailer in which the family lived was filthy, the child did not appear to be receiving proper food because he was "frail and skinny," and he was left unsupervised. Clayton County investigated and determined there was "not sufficient credible evidence to prove or disprove" the allegations.
In August 1991, Clayton County received another report that the home was nasty with trash everywhere, the oldest child never bathed, and a cast on his foot was filthy. Clayton County investigated again, making announced and unannounced visits. The home was found to be cluttered and the caseworker made house-cleaning recommendations. The case was closed after improvements were made.
In January 1993, Clayton County received a report that the three children were wearing only underwear and diapers in the middle of winter, trash and dirty clothes were throughout the home, and the parents were not keeping the youngest child, a three-month-old infant, on an apnea monitor. These allegations were confirmed by a caseworker. During unannounced visits, the caseworker discovered the oldest child, who was over three, wearing a soiled diaper which "was very heavy from the material that was in it" and nothing else. The middle child, who was almost two, was also wearing only a soiled diaper and the caseworker saw him pick up a dirty bottle from the floor and drink spoiled milk. This child communicated with grunting noises and did not speak. Both of these children had matted hair and their feet, face, and hands were black from dirt. The two-month-old infant was sitting in a swing with a towel under her chin to prop up a bottle. The sleeper worn by the infant was dirty and foul-smelling. She was not connected to an apnea monitor as directed by her physician. Mr. and Mrs. Tucker were both at home during one visit and neither one noticed when the bottle fell out of the infant's mouth onto the floor.
The caseworker described the home as unsafe and unsanitary. Dirty clothes and rotten food were strewn throughout the house and there were a lot of "active" roaches and gnats in the home. An outdoor trash can was inside the home and a lot of bugs were crawling out of it into the home. Dirty dishes and diapers were lying on the kitchen floor and it was difficult to navigate.
After the allegations of neglect were confirmed, DFACS assigned two family service workers to the family to work with them on their parenting and hygiene skills. Both parents attended parenting classes. When the situation appeared to stabilize, a caseworker visited only once every two weeks.
In September 1993, a Clayton County police officer responded to a "911 hang-up call" at the Tuckers' residence. When he arrived, he saw an open sliding door in the back of the home and could hear children crying inside. When no one responded to his repeated announcements, he went inside to check on the children. After entering the home, he found a three-year-old, two-year-old, and nine-month-old who were not attended by an adult. The home was in disarray with rotting food on the counter tops and floor of the kitchen. Matches and knives were also lying on the kitchen floor. Fecal matter was on the couch in the living room. The children were caked with dirt, had a foul smell, and their training pants and diapers were filthy.
The officer arrested both of the Tuckers for cruelty to children and took the children into protective custody. When he arrested Mr. Tucker, Mr. Tucker did not offer any *259 explanation for the condition of the children or appear surprised by it.
After taking custody of the children, Clayton County's DFACS prepared a reunification plan which involved progressing from supervised visits to unsupervised visits to overnight visits. Mr. and Mrs Tucker also attended additional parenting classes.
During one overnight visit in April 1994, two caseworkers made an unannounced visit at 3:00 p.m., six hours after the children had been picked up by Mr. and Mrs. Tucker. When the caseworkers knocked on the door, no one answered. When they saw movement in a window, they discovered the children were locked in a room together. For approximately 30 to 35 minutes, they talked to the children through the window and tried to help them get out of the room. During this time period, the oldest child chased the middle child around the room while biting and scratching him. When the caseworkers were unable to free the children, they called their supervisor who notified the police. When the police entered the home after repeatedly announcing their presence, they discovered that the children were locked in a bedroom. Approximately five or six minutes after the police entered the home, Mr. and Mrs. Tucker exited their bedroom, explaining that they had been taking a nap.
After this incident, the Tuckers were once again limited to supervised visits. After the Tuckers progressed again to unsupervised visits and made improvements, the department placed the children back into the home full-time, with the department retaining legal custody. When the Tuckers moved to Rockdale County in February 1995, the judge returned legal custody to the Tuckers and Clayton County DFACS transferred the Tuckers' file to its counterpart in Rockdale County.
Before Clayton County's file was copied and transferred, Rockdale County received an independent report in November 1995 that the children were unsupervised. They initiated an investigation and documented concerns with supervision of the children, the hygiene of the children, and housekeeping in the home. During this time, Mrs. Tucker and the children were involved in an automobile accident. Approximately one week after the middle child was released from the hospital, another referral came in about a cigarette burn on his face. This child frequently missed his rehabilitation appointments following his release from the hospital, and the department took steps to make sure he received his medical care. During the time this department intervened, it continued to receive reports of inadequate supervision and housekeeping standards. When conditions improved in September 1996, the department closed its case.
In February 1997, Rockdale County reopened the case because it received reports that the children were running around unsupervised, there was no food in the home, and the children were not placed in child safety seats or seat belts when riding in an automobile. The department also received reports that Mrs. Tucker was a prostitute, that Mr. Tucker was aware of it, and that this activity took place in the presence of the children. The caseworker testified there was very little food in the home on the first visit after these reports and that she initially thought the home had a dirt floor because there was so much dirt on top of a dirt-colored carpet. The Tuckers moved to Walton County in April 1997, before Rockdale County could complete its investigation and confirm all of the allegations against the Tuckers.
In May 1997, Evelyn Bates, a caseworker employed by the Walton County DFACS, responded to a report that the children were always hungry and had very poor hygiene. Bates interviewed the two older children at their school in the morning and then went to the family home around lunchtime. Bates testified that the trailer was very dirty with clothes strewn from one end of the trailer to the other. There was so little food in the kitchen that Bates told Mrs. Tucker that she would return with food later that afternoon.
When Bates returned around 4:00 p.m., no one answered the door so she asked the eight-year-old boy, who was playing outside, if his mother was at home. He told her that his mother was in her bedroom having sex with a customer. He also told her that his father knew about his mother's customers. *260 When he went inside and told his mother that DFACS was there, his mother came out in a pair of shorts that were buttoned, but not zipped. When she claimed that nothing was wrong and that a friend was visiting, Bates left and called the police from a nearby store.
When the police officer arrived, the two oldest children confirmed to him that their mother had sex with customers. The middle child, who was seven, added that "his daddy sometimes got his mama customers" and that when a customer did not have money "daddy would hit them with a baseball bat." In a later conversation with the police officer, the two older children explained that their mother would get naked with customers on her bed and the youngest child, a four-year-old girl, would sometimes stay in the bedroom while this occurred. When confronted about this activity by the police officers, Mrs. Tucker admitted that she had been practicing prostitution since she moved to Walton County. She was then arrested and the children were placed in foster homes.
When the children were taken into custody, they were very hungry and filthy from accumulated dirt. All of them had lice and nits. The five-year-old had a tick in her ear and the seven-year-old had three wads of paper stuck in his ear which were rotting. None of them knew how to clean themselves after a bowel movement or how to bathe.
Bates testified that after the children were taken into custody, Mr. Tucker denied that the children had been without food, that their clothes were not clean, and that they had not been bathing. He also denied knowing that his wife was prostituting herself. Sergeant Mike McHugh testified that after he arrested Mrs. Tucker for prostitution in May 1997, she told him her husband did know about it and he did not mind.
Elin Reynolds, a foster care case manager with the Walton County DFACS, testified that Mr. Tucker told her on June 10, 1997 that both he and the children knew his wife was prostituting and there was nothing he could do about it. He also told her his wife had probably slept with five hundred men in the previous two months and "that ninety out of a hundred didn't pay her and the remaining would give her ten to twenty dollars." He further admitted that he would fight with his wife in front of the children about not getting enough money out of her sleeping with other men.
During other conversations with Reynolds, Mr. Tucker denied all responsibility for the condition of the home and the children dating back to 1993 when they were first taken into protective custody. He consistently claimed it was his wife's responsibility to take care of the children because he worked all day.
Reynolds also testified that the children were out of control during her supervised visits with Mr. Tucker from June 1997 through August 1997. During the majority of these visits, he sat and read a book while the children ran around the visitation room. The children were so loud that people in adjoining offices were unable to talk on the telephone.
Another Walton County DFACS employee, Renee Harrison, testified that she became responsible for the Tucker case in September 1997 and continued as the caseworker until the July 1998 termination hearing. She supervised the Tuckers' visits with the children, during which the children were frequently out of control, requiring her to intervene several times during the visit to calm them down. Examples of their behavior including throwing objects at the walls, banging on the walls, screaming, standing on tables, and running in and out of the visitation room.
Dr. William Buchanan, a clinical psychologist, interviewed the children, administered a variety of tests, and prepared a psychological assessment in May 1998. Dr. Buchanan testified that he diagnosed all three children as neglected and that the oldest boy's diagnosis also included physical abuse by his father. This child told Dr. Buchanan that his father had thrown him up against a wall and also knocked his teeth out on a separate occasion. All three children had issues with food and were fearful that they would not receive enough to eat. One of them told Dr. Buchanan that the parents would eat in front of the children and not give them anything to eat.
*261 Mr. Tucker testified that he divorced his wife in March 1998, four months before the July 1998 hearing to determine if his parental rights should be terminated. He stated that he had not had any contact with his ex-wife since the summons in his divorce action was served on her. He also testified that he attended parenting classes and obtained a certificate after completing the course in June 1998. He further testified he was currently on lesson five of a seven-lesson home study course on nutrition. He admitted that he had made mistakes in the past and asked the trial judge for "one more chance to show that I can take care of these children."
A trial court is authorized to terminate a parent's rights with respect to a child if there is clear and convincing evidence that the child is deprived due to the parent's misconduct, that the deprivation is likely to continue, and that the continued deprivation is likely to harm the child. OCGA § 15-11-81(a), (b)(4)(A). The appropriate standard of review of the trial court's ruling is whether, viewing the evidence in a light most favorable to the appellee, a rational trier of fact could have found by clear and convincing evidence that the natural parent's rights had been lost. See Blackburn v. Blackburn, 249 Ga. 689, 694, 292 S.E.2d 821 (1982); In the Interest of Y.P., 188 Ga.App. 554, 555, 373 S.E.2d 657 (1988).
In this appeal, Tucker's sole enumeration of error is that there was a lack of clear and convincing evidence that the children's deprivation was likely to continue or was not likely to be remedied. OCGA § 15-11-81(b)(4)(A)(iii). The facts recited above, established at the termination hearing by clear and convincing evidence, show the deprivation of Tucker's three children was likely to continue, and would not be remedied if they remained with their father. A court can consider the past conduct of a parent when determining whether conditions of deprivation are likely to continue. In the Interest of K.W., 233 Ga.App. 140, 143(2), 503 S.E.2d 394 (1998). "The decision as to a child's future must rest on more than positive promises which are contrary to negative past fact." In the Interest of J.L.Y., 184 Ga.App. 254, 257(2), 361 S.E.2d 246 (1987).
In this case, the fact that Mr. Tucker is now divorced from his wife and has attended yet another round of parenting and nutrition classes does not overcome the clear and convincing evidence that deprivation of the children is likely to continue. Mr. Tucker attended several parenting classes in the past and the conditions in the home did not permanently improve. Mr. Tucker cannot place all of the blame for the past deprivation of his children on his ex-wife simply because he worked during the day and relied on her to care for the children. Both parents are responsible for the care and well-being of their children and if one of them fails in this duty, it is the obligation of the other to carry the load. Mr. Tucker received numerous chances to show he could properly care for his children and failed to do so. As a result, the trial court did not err in terminating Tucker's rights under OCGA § 15-11-80(b)(4).
Judgment affirmed.
BLACKBURN, P.J., and Senior Appellate Judge HAROLD R. BANKE concur.