A99A2231. IN THE INTEREST OF C. G. B., a child.
(531 SE2d 107)

RUFFIN, Judge.

Appellant, the mother of C. G. B., appeals from the Rockdale County Juvenile Court's order terminating her parental rights.[1] The mother contends that the trial court erred (1) in finding that the deprivation is likely to continue; (2) in making certain factual findings that are unsupported by the record; (3) in failing to order the Department of Family & Children Services (DFACS) to consider alternatives to terminating her rights; (4) in admitting hearsay; and (5) in considering a report that had not been tendered into evidence. Because the mother's contentions lack merit, we affirm.

On appeal from a termination of parental rights, we view the evidence in a light most favorable to the juvenile court's order and determine whether any rational trier of fact could have found by clear and convincing evidence that the mother has lost her parental rights.[2] We neither weigh the evidence nor determine witness credibility. Rather, "we defer to the trial court's factfinding and affirm unless the appellate standard is not met."[3]

So viewed, the evidence shows that appellant is the mother of C. G. B., who was born on May 20, 1996. On May 19, 1998, the Rockdale County Sheriff's Department learned that the mother, who

---

[1] In an earlier order, the juvenile court terminated the parental rights of one of many putative fathers, Alfonso Gonzalez. The trial court later terminated the parental rights of several other putative fathers.

[2] *In the Interest of S. N. N.*, 230 Ga. App. 109 (495 SE2d 602) (1998).

[3] (Punctuation omitted.) Id.

was incarcerated on child cruelty charges, had left C. G. B. with a neighbor who could no longer care for the child. When a deputy retrieved C. G. B., he was dirty, bruised, malnourished and dehydrated. Elaine Manning, a DFACS caseworker who saw C. G. B. shortly after he was taken into custody, described him as gaunt, unhealthy-looking, and very small for his age.

On May 20, 1998, DFACS filed a deprivation petition, and the trial court issued an emergency order placing C. G. B. in the temporary custody of DFACS. Following a detention hearing on the same day, the juvenile court issued an order in which it noted that appellant had a history of drug and alcohol abuse and that she appeared to be under the influence of drugs while at the Rockdale County jail.

A week later, the juvenile court conducted a hearing, at which time the parties stipulated that C. G. B. was deprived. The results from the court-ordered drug test that was tendered at the hearing showed that the mother had cocaine in her system. The court ordered that DFACS prepare a case plan requiring that the mother (1) complete a drug and alcohol evaluation; (2) submit to random drug screens; (3) release her treatment records to DFACS; (4) maintain stable employment; (5) maintain stable housing and keep DFACS informed of address changes; and (6) complete parenting classes. Appellant also was required to help provide financial support for C. G. B., and C. G. B. was placed in foster care.

On August 14, 1998, the mother called DFACS to schedule a visit with C. G. B.[4] Manning arranged to meet with the mother and Alfonso Gonzalez — who the mother said was the child's father — to discuss her case plan prior to the visit with C. G. B. When they met on August 20, 1998, Manning asked the mother about the fact that she had previously identified a man other than Gonzalez as the father. Appellant claimed she had been "messed up" when she made the earlier statement. When asked what she meant by "messed up," the appellant said that she had been going through withdrawal from drugs and alcohol.

During the meeting, Manning expressed concern about the length of time that had passed since the mother had last attempted to see C. G. B., and the two discussed whether the appellant wanted her child back. The appellant said that she did want her child, and Manning explained that appellant would have to meet the case plan goals in order to get C. G. B. returned to her. Manning asked about the mother's progress, and she admitted that she had made no prog-

---

[4] Using case notes, a caseworker testified about events from May 27, 1998, the date of the deprivation hearing, to August 13, 1998. But the trial court ruled that the testimony was hearsay and that it would not consider the hearsay in its ruling. Accordingly, we have not considered any such testimony.

ress toward any of the case plan goals. Manning then asked how the mother planned to support her child, and she said she was going to marry Gonzalez and that he would support them. Manning pointed out that their relationship had been unstable in the past, and appellant acknowledged that there had been some physical violence. But the mother claimed that she and Gonzalez had "worked out their problems."

On September 3, the mother left a message with DFACS that she had moved to a new address but did not have a telephone number. The mother said that she would call back, but Manning did not hear from her. On September 8, Manning sent a letter to the new address reminding the mother of the case plan requirements, informing her that a panel review was scheduled for September 17, 1998, and requesting that she attend the review. Manning wrote that, given the mother's lack of progress and motivation, she was going to recommend nonreunification.

When the mother called DFACS on September 14, 1998, her voice was slurred. The mother told Manning that Gonzalez was not C. G. B.'s father and that he had thrown her out of the house. Manning asked the mother where she was, but she would not give her the address. Manning told the mother about the September 17 panel review, and the mother indicated that she knew about it and that she would attend. When Manning asked the mother if she would take a drug screen, she responded "you don't trust me" and hung up on her.

In September 1998, DFACS transferred the file to caseworker Laura Barnes. Barnes and Manning attended the September 17 panel review, but the mother failed to attend. On September 28, the mother called Barnes to let her know that she had been in jail on September 17 for assaulting a police officer. According to the mother, she had been drinking that day and did not remember whether she had hit the officer. The mother also requested another visit with C. G. B., and a visit was scheduled for October 5 at DFACS's offices. On that date, C. G. B. arrived with his foster mother at 10:00 a.m., but the appellant did not appear. She called over four hours later to explain that she could not get a ride. But, according to Barnes, the mother lived within walking distance of DFACS at the time.

The mother called Barnes again on October 22, and Barnes asked about her progress with her case plan. According to Barnes, the mother was evasive. The mother said she wanted to see her child, but Barnes asked to meet with the mother prior to scheduling a visit. They arranged to meet on October 27 at DFACS. The mother called on October 26 to tell Barnes that she had no transportation. Barnes told the mother that she would go to the mother's home instead.

When Barnes arrived at the trailer, she saw an estimated 150-200 cans, most of which were empty beer cans. The mother admitted

that there were enough beer cans to fill four Hefty bags but told Barnes that the men who lived in the trailer had drunk the beer. The mother told Barnes that she shared the two-bedroom trailer with her fiancé, Pedro, and four of his relatives. But the mother could not provide Pedro's last name or the names of any of the other residents. Barnes reminded the mother that the case plan required her to be employed and asked her how she planned to support C. G. B., and the mother responded that she planned to let Pedro support her and her child.

Following this visit, Barnes attempted to call the mother on October 30, November 2, and November 5, but was unable to reach her. A certified letter that Barnes sent to the mother was returned as undeliverable. On November 12, Barnes drove by the trailer where she had met with the mother, and it appeared abandoned. Barnes later returned to the trailer and spoke with the mother's "fiancé," Pedro, who said that appellant had left him. Barnes also called the mother's probation officer and learned that he had not seen the mother since November 25 and did not know where she was. On December 1, DFACS filed a petition to terminate the mother's parental rights based upon her failure to comply with her case plan.

At the April 22, 1999 termination hearing, the mother testified that she had been incarcerated from January 16 through February 9, 1999, at which time she was transferred to a diversion center. As part of the program at the diversion center, the mother was required to hold a job. If she was not at the job, the mother was required to return to the center. The mother obtained a job at Church's Fried Chicken. Prior to this job, the mother testified that she had not worked in three and a half years. Although the mother began earning money, she did not contribute toward the support of her child. She claimed that the diversion center took her paychecks for rent and unpaid fines. But she also testified that she was given an allowance out of her earnings.

While at the diversion center, the mother made no attempt to contact DFACS despite the fact that she had telephone privileges. The mother also testified that the diversion center provided passes to leave the facility, but she did not try to obtain a pass to see her child.

At the time of the hearing, the mother was still at the diversion center. She testified that she was scheduled to be released in a matter of weeks and that, when she was released, she planned to move in with her sister. The mother also said that, while at the center, she had undergone drug and alcohol treatment and had started parenting classes. She further testified that she had obtained a Social Security card and was in the process of obtaining her GED.

On May 19, 1999, the trial court entered an order terminating the mother's parental rights. In concluding that the mother did not

comply with the case plan, the trial court found that she failed to (1) obtain treatment for her drug and alcohol addiction; (2) remain in regular contact with DFACS; (3) maintain stable housing and stable employment; (4) provide any financial support for her child; and (5) establish a parental bond with the child. In five enumerations of error, the mother contends that the trial court erred in terminating her parental rights.

The decision to terminate parental rights involves a two-step process. First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional or moral harm to the child.[5] If all four findings are made, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional and moral condition and needs, including the need for a secure, stable home.[6]

1. In her first enumeration of error, the mother argues that the trial court erred in finding that the deprivation is likely to continue. A trial court can consider a parent's past conduct in determining whether the deprivation is likely to continue.[7] Here, the mother's past conduct clearly and convincingly demonstrated that the deprivation is likely to continue.

During her 11 months without her child, the mother saw him only twice. Prior to her incarceration in the diversion center, she made no attempt to comply with any requirement of the case plan. She failed to obtain a job. She did not maintain stable housing, and she did not keep DFACS informed of her whereabouts. Although the diversion center required that the mother get a job, she utterly failed to provide any financial support for her child.

The mother points to the positive steps she has taken since her incarceration to support her assertion that the deprivation is unlikely to continue. But "[t]he decision as to a child's future must rest on more than positive promises which are contrary to negative past fact."[8] Under these circumstances, the trial court did not err in finding that the deprivation is likely to continue.

2. The mother further contends that the trial court erred in basing its findings upon allegations not supported by the record. Specifi-

---

[5] OCGA § 15-11-81 (b) (4) (A) (i)-(iv); *In the Interest of L. H.*, 236 Ga. App. 132-133 (1) (511 SE2d 253) (1999).

[6] OCGA § 15-11-81 (a).

[7] *In the Interest of D. L. T.*, 238 Ga. App. 491, 496 (519 SE2d 257) (1999).

[8] (Citation and punctuation omitted.) Id.

cally, she argues that the trial court erred in finding that (1) she failed to obtain treatment for her drug and alcohol addiction; (2) she has a history of chronic, unrehabilitated drug and alcohol abuse; and (3) she lacked a parental bond with C. G. B.

The record demonstrates that, prior to her incarceration in the diversion center, the mother was drunk on several occasions and had cocaine in her system at least once. She admitted that she had a drinking problem and that she had used drugs in the past. Although the mother testified that she had undergone drug and alcohol treatment at the diversion center, she provided no additional evidence to support her self-serving testimony.

Pretermitting whether this evidence is sufficient to support the trial court's findings that the mother had a history of chronic, unrehabilitated drug and alcohol use and that she failed to obtain treatment, we find no reversible error. The findings regarding the mother's drug and alcohol use were not the only bases for the trial court's termination of appellant's parental rights, "and other competent evidence was sufficient to support a finding of parental misconduct or inability."[9] Namely, the mother showed an appalling lack of interest in her child, failed to comply with any aspect of the case plan until she was forced to obtain a job while at the diversion center, and even then failed to make any attempt to contact her child.

With respect to the mother's contention that the trial court erred in finding that she lacked a parental bond with C. G. B., we find this contention meritless. C. G. B. was two years of age when he was taken away from his mother. By the mother's own admission, she has seen her child only once since signing the case plan in June 1998. It strains credulity to think that a mother could have a meaningful bond with such a young child after such minimal contact. Moreover, Manning, who saw the mother interact with C. G. B. during one visit, testified that she could not tell whether the child even recognized his mother. Accordingly, "[t]he trial court's findings, as well as its conclusion that the mother's parental rights should be terminated, are supported by the record, and she has shown no basis for reversal."[10]

3. We also reject the mother's assertion that the juvenile court erred in failing to order DFACS to consider less restrictive alternatives to termination. The evidence supports the court's determination that termination is appropriate.[11] Additionally, we note that the trial transcript shows that DFACS searched for relatives with whom to place C. G. B. but was unable to locate anyone suitable or willing to

---

[9] *In the Interest of J. K.*, 239 Ga. App. 142, 145-146 (1), n. 4 (520 SE2d 19) (1999).

[10] *In the Interest of S. C. M. H.*, 238 Ga. App. 159, 164 (3) (517 SE2d 598) (1999).

[11] See *In the Interest of N. B.*, 239 Ga. App. 336 (521 SE2d 47) (1999) (parental rights terminated where mother, who was transient, failed to comply with case plan).

care for the child.[12]

4. The mother contends that the trial court erred in admitting prejudicial hearsay evidence. After C. G. B. was taken into DFACS's custody, his case initially was handled by Helen Renfro, a caseworker who subsequently left DFACS and was not present at the termination hearing. Over objection, the trial court allowed Barnes to testify from Renfro's case notes. During a break, however, the trial court reconsidered and concluded that the testimony was inadmissible hearsay. The court then stated that it would disregard any hearsay.[13] But appellant argues that the hearsay was so prejudicial that it requires reversal notwithstanding the trial court's subsequent ruling. We disagree.

During a nonjury trial, it is presumed that the court is able to "sift the wheat from the chaff and select only the legal evidence."[14] We will reverse the trial court only where there is no legal evidence to support the trial court's ruling.[15] Here, there was ample admissible evidence supporting the trial court's determination. Thus, we find no reversible error.[16]

5. In her final enumeration of error, the mother maintains that the trial court erred in considering reports filed by a court-appointed special advocate (CASA) and by allowing the CASA to make a statement at the end of the hearing. As set forth in OCGA § 15-11-33 (d), however, "all information helpful in determining the questions presented, including oral and written reports, may be received by the court and relied upon to the extent of its probative value even though not otherwise competent in the hearing."[17] To the extent that any of the information was hearsay, the court is presumed to have disregarded it.[18] Accordingly, we affirm.

*Judgment affirmed. Andrews, P. J., and Ellington, J., concur.*

DECIDED MARCH 10, 2000.

---

[12] *In the Interest of S. C. M. H.*, supra at 164 (4).

[13] We note that, despite the trial court's exclusion of the hearsay evidence, the State cites this testimony in its brief. This use of excluded testimony was unnecessary, and it made this Court's job far more difficult and time-consuming. We remind the State that attorneys have an affirmative obligation to accurately state the facts of a case and that failure to do so may subject them to fines for contempt. *Benson v. State*, 233 Ga. App. 58, 59, n. 1 (503 SE2d 316) (1998).

[14] (Punctuation omitted.) *Jafari v. Simpson Organization*, 214 Ga. App. 589, 592 (2) (448 SE2d 493) (1994).

[15] *In the Interest of M. A. C.*, 244 Ga. 645, 655 (4) (261 SE2d 590) (1979).

[16] *In the Interest of M. L. P.*, 236 Ga. App. 504, 510-511 (2) (512 SE2d 652) (1999).

[17] Id.

[18] Id.

*Lavigno & Schlueter, Richard R. Schlueter*, for appellant.

*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Laura W. Hyman, Assistant Attorneys General, Mumford, Myers & Mooney, Albert A. Myers III*, for appellee.