A04A1152. IN THE INTEREST OF K. J. et al., children.
(603 SE2d 497)

RUFFIN, Presiding Judge.

The juvenile court terminated the natural mother's parental rights to her five children, K. A. J., K. E. J., F. J., S. J., and C. J. In her sole enumeration of error on appeal, the mother contends that insufficient evidence supports the juvenile court's ruling. For reasons that follow, we disagree and affirm.

In reviewing a juvenile court's termination order, we view the evidence in the light most favorable to that court's decision, and we will affirm if the record demonstrates that any rational trier of fact could have found by clear and convincing evidence that the parent's right to custody has been lost.[1]

Viewed in this light, the record reveals that the mother had her first child at the age of 13 and her sixth at age 24. She quit school after the eighth grade and has never received any vocational training. The mother does not have a driver's license or a car. Furthermore, the mother has little income. She has received federal benefits totaling $300-$350 per month for approximately 37 months. But the mother is eligible only for another 11 months of such benefits. The mother lives in government-subsidized housing for which she pays less than $100 per month.[2] However, the mother may lose her subsidized housing because she misrepresented to the housing authority that her children still live with her.

Beginning in 1999, DFCS received reports regarding the mother's possible neglect of her children and began investigating the

---

[1] See *In the Interest of J. M. M.*, 244 Ga. App. 171 (534 SE2d 892) (2000).

[2] A Department of Family and Children Services (DFCS) caseworker testified that the mother's rent was $50 per month, but the mother testified that rent was $77 per month.

matter. In October 1999, DFCS opened a case file after the mother refused to pick up one of her children from school. In June 2000, DFCS discovered bruises on K. E. J.'s leg, which he attributed to his mother "spank[ing] him with an extension cord." Gail Phelps, the DFCS caseworker, tried to get the mother to sign "a safety plan," indicating "that she would not use physical discipline on the children." The mother refused, and the children were removed from her custody. The mother subsequently stipulated that the children were deprived based upon the mother's mental health needs, her need for parenting classes and therapy, and the children's need for mental health care.

DFCS developed a reunification case plan, which required, inter alia, that the mother address her mental health needs, obtain employment, take parenting classes, enroll in a vocational program, and maintain a relationship with her children through visitation. Although the case plan, which was renewed, was in place for over two years, the mother never fully completed the plan. Significantly, the mother failed to complete any vocational training or obtain stable employment. During the years the case plan was in effect, the mother had pay stubs indicating that she had worked a total of three months in a part time job. The mother told her caseworker that she worked six months longer, but subsequently admitted lying to the caseworker. Furthermore, the mother never paid any child support and was over $2,700 in arrears for payments required under a child support order.

In March 2002, DFCS petitioned to terminate the mother's parental rights. At the hearing on this petition, DFCS presented evidence that four of the mother's five children were in therapeutic foster care as a result of myriad psychological problems. K. A. J., age four, and F. J., age five, are both being seen by Dr. Ahmadi. Both girls have been diagnosed as bipolar and require medication and ongoing treatment. Similarly, two of the mother's boys, K. E. J., age six, and S. J., age nine, receive therapy and medication for behavioral disorders. All four children have improved while in foster care. C. J., age 11, is in foster care in another home and is also in therapy.

Only one of the children, C. J., was in foster care in Athens, where the mother lives. Despite C. J.'s proximity, the mother missed multiple scheduled visits with him. The four children in therapeutic foster care had placements in Warner Robins, so the mother was unable to visit them weekly. On October 2, 2001, DFCS arranged for the mother and C. J. to travel to Warner Robins to visit the four youngest children. During the visit, S. J. screamed at his mother that he hated her and that he was never coming home. According to the DFCS caseworker present during the visit, K. E. J., K. A. J., and F. J. "were very wild" and fought and chased each other around the room. After 20 minutes, the caseworker ended the visit because "[i]t was

very detrimental to the children." According to K. E. J. and S. J.'s foster father, it took S. J. several hours to calm down after the visit ended.

Given the negative effect the visit had on the children, DFCS suspended visitation with the four children in Warner Robins for a time. The mother and C. J. returned to Warner Robins in September 2002. At the beginning of the visit, both K. E. J. and S. J. hugged their mother. However, after S. J. refused to hug his mother again, she did not talk with him. When the visit ended, K. E. J., K. A. J., and F. J. hugged their mother goodbye. But, according to the caseworker, the children displayed no emotion when saying goodbye. On the trip back to Athens, C. J., who was sitting next to his mother, began to cry. The mother offered no comfort to C. J., and she fell asleep.

As part of her case plan, the mother underwent a psychological evaluation. After the evaluation, the psychologist recommended that the mother participate in therapy "to improve anger control, teach coping skills, [and] reduce symptoms of depression." However, the mother apparently failed to attend her therapy sessions.

The mother testified at the termination hearing. When asked about current employment, the mother claimed that she earned $100-$150 per week babysitting. However, the mother was unable to provide proof other than her self-serving testimony that she earned such money, and the juvenile court rejected the mother's testimony in this regard. The mother also testified that if her children were returned to her, she would find another job. In the interim, the mother said that she would continue babysitting because "[i]t ain't hard to take care of no kids." When asked about her ability to take care of children with special needs, the mother responded that she would "be a mom to them." And as for providing the children transportation to their appointments, the mother said that she has "family that's going to help."

Based upon this and other evidence, the juvenile court terminated the mother's parental rights. The juvenile court noted, inter alia, that

> [f]or two years the mother has been relieved of the responsibility for parenting these children on a day to day basis and has been given the opportunity and structure to grow and improve herself so that she may become able to parent these children. She has not made any significant improvement. She has no concrete plan or strategy to enable herself to be a parent to these children except to "be a mom."

We find no error in the juvenile court's ruling.

A termination of parental rights case involves a two-step analysis.[3] First, the juvenile court must find parental misconduct or inability, and such finding

> must be supported by clear and convincing evidence that: (i) the child is deprived; (ii) lack of proper parental care or control caused the deprivation; (iii) the cause of the deprivation is likely to continue; and (iv) continued deprivation is likely to cause serious physical, mental, emotional or moral harm to the child.[4]

If these four findings are made, the juvenile court next determines whether termination of parental rights is in the best interests of the children, considering the children's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.[5]

On appeal, the mother argues that there is no evidence: (1) that the children are deprived; (2) that the deprivation is caused by lack of proper parental care or control; (3) that the deprivation is likely to continue; or (4) that termination is in the children's best interests. We address each argument in turn.

1. According to the mother, there is no evidence of deprivation. However, the mother stipulated to the children's deprivation, and the juvenile court included this stipulation in its deprivation order. There is no evidence that the mother appealed this order, and "the unappealed deprivation order of the juvenile court is sufficient to establish that the child[ren were] deprived within the meaning of OCGA § [15-11-94] (b) (4) (A) (i)."[6]

2. In a related argument, the mother contends that there is no evidence that the children's deprivation is caused by a lack of proper parental control. We disagree.

When examining the issue of proper parental care and control of children in State custody, "the juvenile court must consider whether, during the period before DFCS filed the termination petition, the parent significantly failed to comply with a reunification plan for one year. The parent's failure to support the child as required by law also factors into this inquiry."[7]

---

[3] See *In the Interest of J. L. K.*, 245 Ga. App. 860, 861 (539 SE2d 507) (2000).
[4] Id.
[5] See *In the Interest of C. G. B.*, 242 Ga. App. 705, 709 (531 SE2d 107) (2000).
[6] (Punctuation omitted.) *In the Interest of V. M. T.*, 243 Ga. App. 732, 736 (3) (534 SE2d 452) (2000). See also *In the Interest of D. A. E.*, 251 Ga. App. 232, 233 (554 SE2d 228) (2001) (where "the juvenile court took judicial notice of a prior deprivation order").
[7] (Footnote omitted.) *In the Interest of N. Q.*, 260 Ga. App. 118, 120 (1) (b) (578 SE2d 920)

Here, the record shows that the mother paid no child support during the two years her children were in State custody. And, despite having over two years in which to obtain a job as required by the case plan, the juvenile court found that the mother failed to do so.[8] Obtaining employment is extremely important to the mother's ability to parent her children. The mother's resources are dwindling — she makes little money, she is in danger of losing her housing situation, and she will soon be ineligible for federal benefits. Rather than using the past two years as an opportunity to improve her condition, the mother chose to maintain the status quo.

Moreover, the record shows that the mother failed to keep therapy appointments as required by the case plan. According to the mother, the testimony in this regard is hearsay and should not be considered. However, "all information helpful in determining the questions presented, including oral and written reports, may be received by the court and relied upon to the extent of its probative value even though not otherwise competent in the hearing on the petition."[9] To the extent such reports constitute hearsay, "the courts are presumed to have disregarded it."[10] Here, the mother essentially admitted that she did not attend therapy, and thus we will not assume that the juvenile court relied upon hearsay in making its finding. Under these circumstances, the clear and convincing evidence supports the juvenile court's finding that the children's deprivation stems from a lack of parental care and control.[11]

3. The mother also maintains that there is insufficient evidence that the deprivation is likely to continue. Specifically, the mother asserts that there is no evidence that she is unfit or destitute. Again, we disagree.

"A trial court can consider a parent's past conduct in determining whether the deprivation is likely to continue."[12] As noted by the juvenile court, the mother had over two years in which to procure

---

(2003). See also *In the Interest of J. P.*, 268 Ga. App. 32, 37 (601 SE2d 409) (2004) (" 'A [mother's] failure to support [her] child[ren], even in the absence of an order directing the [mother] to pay a specific amount for the child[ren's] support, is compelling evidence that the [mother] is not an able parent.' ").

[8] Contrary to the mother's contention on appeal, the juvenile court was not *required* to believe her testimony that she had a job babysitting. It is the role of the juvenile court to act as factfinder and to judge the credibility of a witness or the lack thereof and to decide whether to disregard the testimony. See *In the Interest of J. M. M.*, supra. Given the mother's admission that she lied to the caseworker regarding the months she worked, the court had some basis for questioning the mother's self-serving testimony.

[9] OCGA § 15-11-56 (a).

[10] (Punctuation omitted.) *In the Interest of O. J.*, 257 Ga. App. 1, 4 (2) (570 SE2d 79) (2002).

[11] See *In the Interest of N. Q.*, supra at 120-122; *In the Interest of J. P.*, supra; *In the Interest of M. A. M.*, 261 Ga. App. 664, 665 (1) (b) (583 SE2d 517) (2003).

[12] *In the Interest of C. G. B.*, supra at 709 (1).

stable employment. She also was given the opportunity to obtain vocational training. The mother did neither. Although the mother claims that, if her children are returned to her, she will find a better job, find some way to take her children to therapy, and otherwise "be a mom" to her children, "the decision as to [the] child[ren's] future must rest on more than positive promises which are contrary to negative past fact."[13] Given the lack of evidence that the mother was capable of successfully parenting her children, the juvenile court was authorized to find that the deprivation would continue.[14]

4. Finally, the mother argues that there is no evidence that termination of parental rights is in the children's best interests. "The same factors that show parental misconduct or inability can support a juvenile court's finding that termination of parental rights is in the child[ren's] best interest[s]."[15] And "[t]he court may consider the children's need for a secure, stable home."[16] Here, the record shows that the four children in Warner Robins have improved while in therapeutic foster care. Although the mother testified that "[i]t ain't hard to take care of no kids," taking care of children with special needs is challenging. Thus, the mother's lack of a clear plan for parenting such children demonstrates that she is not up to the challenge. Four of the five children require ongoing therapy, and the mother has no independent means to ensure that the children make it to their appointments. And a psychological evaluation of C. J., the oldest child, shows that he requires ongoing counseling and a stable home. Under these circumstances, the clear and convincing evidence supports the juvenile court's conclusion that termination is in the best interests of the children. Thus, the court did not err in terminating the mother's parental rights.[17]

*Judgment affirmed. Eldridge and Adams, JJ., concur.*

DECIDED AUGUST 11, 2004.

*Lisa Lott*, for appellant.

*Thurbert E. Baker, Attorney General, William C. Joy, Shalen S. Nelson, Senior Assistant Attorneys General, Laura W. Hyman, Assistant Attorney General, Kathryn A. Pope*, for appellee.

---

[13] (Punctuation omitted.) Id.

[14] See *In the Interest of D. B.*, 242 Ga. App. 763, 765-766 (531 SE2d 172) (2000).

[15] *In the Interest of V. M. T.*, supra at 736-737 (3).

[16] *In the Interest of G. C.*, 263 Ga. App. 503, 505 (1) (b) (588 SE2d 297) (2003).

[17] See id. at 506.