A06A0789. IN THE INTEREST OF C. N. I., a child.
(633 SE2d 660)

PHIPPS, Judge.

The parents of C. N. I. appeal the termination of their parental rights, challenging the sufficiency of the evidence. Because the evidence was sufficient, we affirm.

---

In August 2003, the Department of Family and Children Services (DFCS) filed in juvenile court a petition alleging that C. N. I., who was born in September 2002, was deprived. DFCS stated therein or in subsequent amendments that it had been working with C. N. I.'s family since October 2002; that it had already been given temporary custody of C. N. I.'s older two siblings; and that C. N. I.'s parents had made no significant progress on case plans relative to those two children. DFCS reported that, based on recent visits to C. N. I.'s home, it had concluded that the child's parents' uncleanliness and lack of hygiene created an unsafe and unhealthy environment for the toddler. In particular, DFCS cited cigarette butts in an ashtray on the floor; dirty diapers on the floor; dried food on the table of a high chair and on the floor; and soiled and dirty sheets on C. N. I.'s bed. In addition, DFCS reported that the child was drinking milk out of a cup that appeared to have not been washed for days; she had diaper rash; and, as of October 7, 2003, she had not been taken for her one-year checkup.

After a hearing, the juvenile court entered an order in November 2003 adjudicating C. N. I. deprived based on its determination that her parents' neglect was causing her to be exposed to filthy conditions in their home. The court placed C. N. I. in the temporary custody of DFCS and directed it to prepare a case plan for C. N. I.'s parents to be reunited with her.

The case plan DFCS prepared was designed to allow the parents to demonstrate their ability to care for and supervise C. N. I. It required them to obtain and maintain for six months a source of income and provide verification of such; obtain and maintain for six consecutive months stable, clean, and safe housing that could accommodate C. N. I.; maintain meaningful contact with the child; pay certain amounts of child support; complete anger management assessments, follow through with all professional recommendations, and provide verification to DFCS that this goal had been met; attend and successfully complete parenting classes and provide certificates of completion to DFCS; ensure that there would be no drugs or drug paraphernalia in the home; arrange childcare services or proper supervision for C. N. I.; and cooperate with DFCS to develop a household budget. The case plan also required C. N. I.'s father to legitimate her. The court adopted the case plan in December 2003.

In February 2005, DFCS filed a petition to terminate the parental rights of both parents, alleging parental misconduct or inability within the meaning of OCGA § 15-11-94. DFCS claimed in particular that the parents had failed significantly to comply with the court-ordered case plan designed to reunite them with their child. After a hearing, the court granted the petition.

Termination of parental rights under OCGA § 15-11-94 requires the juvenile court to undertake a two-step process. First, the court must determine whether there is clear and convincing evidence of parental misconduct or inability as provided in OCGA § 15-11-94 (b). Under that Code section, parental misconduct or inability may be found when (1) a child is deprived; (2) the cause of the deprivation is lack of proper parental care or control; (3) such deprivation is likely to continue or not likely to be remedied; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If there is clear and convincing evidence of parental misconduct or inability, OCGA § 15-11-94 (a) then requires the court to consider whether terminating the parent's rights is in the best interest of the child, after considering the physical, mental, emotional, and moral condition and needs of the child, including the need for a secure and stable home. On appeal, we construe the evidence in the light most favorable to the findings of the juvenile court, and our standard of review is whether a rational trier of fact could have found that the parent's rights should be terminated.[1]

1. The juvenile court's order finding by clear and convincing evidence that C. N. I. was deprived was not appealed. Therefore, the parents are bound by that finding.[2]

2. In determining whether the lack of parental care or control is the cause of a child's deprivation, the court shall consider, among other things, the "[p]hysical, mental, or emotional neglect of the child or evidence of past physical, mental, or emotional neglect of the child or of another child by the parent."[3] And where, as here, the child is not in the custody of the parents who are the subject of the proceedings, the court shall consider, without being limited to, whether the parents unjustifiably failed significantly for at least one year before the termination petition was filed to provide for the care and support of the child as required by law and to comply with a court-ordered plan designed to reunite the child with the parent.[4]

Evidence showed that the mother's other two children were adjudicated deprived because of parental neglect before C. N. I. was

---

[1] *In the Interest of H. D. T.*, 273 Ga. App. 863-864 (616 SE2d 196) (2005) (citations and punctuation omitted).

[2] See id. at 866 (a).

[3] OCGA § 15-11-94 (b) (4) (B) (v).

[4] OCGA § 15-11-94 (b) (4) (C).

so adjudicated.[5] After agreeing to a reunification plan as to those children, the mother surrendered her parental rights to them.

Evidence also showed that for a year before the filing of the termination petition the parents had failed significantly to pay child support. As of about two weeks before the hearing, the father had arrears of over $4,000, and the mother had arrears of over $3,000.

Evidence showed that the parents had otherwise failed to comply with the case plan for at least a year. For example, they had failed to obtain and maintain adequate housing for six months. During the fourteen months prior to the deprivation hearing, the parents had lived in about six different locations. DFCS caseworkers and employees of the Family Art Therapy Center, an entity through which DFCS provided certain services to the family, gave accounts of their home visits. The DFCS caseworker who was involved with the family from October 2003 through about August 2004 described the conditions at two of the couple's homes. On numerous occasions, pet urine and feces were on the floor, even beside a baby crib. Bedding was stained, and the carpet was so filthy that its color could not be discerned. The floors were sticky and dirty. There were usually dead flies or other insects on the freezer, and at one time, there was no refrigerator in the home. On each visit, there were stacks of dirty dishes in the kitchen, clutter in the hallways, and debris in the yards.

A Family Art parent aide visited one of these locations and testified that the residence needed cleaning and exterminating because "the roaches were pretty bad." In addition, car parts were strewn about the yard, rendering it an unsafe place for C. N. I.

The parents eventually moved into a tent behind the father's grandparent's house. Although a Family Art employee asked to visit the tent, the parents forbade it and did not disclose their exact location.

Next, the parents moved into the home of the father's father. A DFCS caseworker then assigned to the case visited that home around October 2004 and testified, "[I]t was very very unsanitary. There was smoke in the air so bad that you felt like you had to cut it with a knife. . . . [T]here was food laying around the kitchen, much — you know, dishes, pots, pans, food, you know, and very unsanitary." The caseworker was not allowed into two of the three bedrooms. A Family Art parent aide also visited the home. She testified that the residence was too small and described the relationship between the couple and the father's parents as "hostile." Trash in the yard rendered it unsafe for C. N. I., and the parent aide was not allowed to look beyond the living room and kitchen.

---

[5] C. N. I.'s father is not the father of these two children.

From there, the couple moved to another location, where they stayed for about a month, and then into the home of the mother's mother. A Family Art parent aide visited that residence and found it too small, also; even the parents told the aide that they did not want to bring C. N. I. there. The weekend before the hearing, the parents moved again. However, no DFCS or Family Art personnel had yet visited that location.

Evidence showed that the parents had failed to meet the goal pertaining to obtaining a source of income. That goal specifically required one parent to be employed full-time, and the other parent to be employed part-time. While under the case plan, the mother had worked for about a month. The father had worked about five or six months, but not consecutive months. According to a Family Art aide, he had held no job for longer than a month and a half. At the start of the case plan, the father was employed by the county road department. When released from there, he found a job at Goldkist, but failed to follow through with that opportunity. At one point, the father claimed to DFCS that he was employed repairing mobile homes for his landlord, but he never provided DFCS with any verification of this employment. Last, he claimed to DFCS that he was working "odd jobs," but never provided DFCS with any verification of such employment.

Evidence showed that the mother visited C. N. I. regularly, but the father visited sporadically. One DFCS caseworker who had monitored about six or seven of C. N. I.'s visitations with her parents testified that the child had seemed uncomfortable with the parents, particularly when she was younger. There was evidence that the parents completed parenting classes and that the father completed the goal pertaining to anger management assessments. There was no evidence of drug use by the parents. The parents cite no evidence that they arranged childcare services or proper supervision for C. N. I., that they had cooperated with DFCS to develop a household budget, or that the father ever legitimated C. N. I.

Based on all of the above, there was evidence showing that, for a period of at least one year prior to the filing of the termination petition, the parents failed significantly to comply with the court-ordered plan designed to reunite them with C. N. I. And there was no showing of any justification for their failure. Viewing the evidence in the light most favorable to the juvenile court's determination, we conclude that a rational trier of fact could have found by clear and convincing evidence that C. N. I.'s deprived status was caused by the parents' lack of proper parental care or control.[6]

---

[6] See *In the Interest of A. R. A. S.*, 278 Ga. App. 608, 613 (2) (d) (629 SE2d 822) (2006); *In*

3. A rational trier of fact could have found by clear and convincing evidence that the cause of C. N. I.'s deprivation was likely to continue. In determining whether conditions that caused the child's deprivation are likely to continue, a court may consider the past conduct of the child's parents.[7] Despite the passing of over a year, the parents secured no employment and no residence that could accommodate C. N. I. Given the lack of evidence that the parents were capable of or willing to successfully parent C. N. I., the juvenile court was authorized to find that the deprivation would continue.[8]

4. The same evidence that authorized the juvenile court to determine that C. N. I. was deprived due to lack of proper parental control or parental inability and that such deprivation was likely to continue further provided clear and convincing evidentiary support that such continued deprivation would likely have caused serious physical, mental, emotional, or moral harm to the child.[9]

5. Clear and convincing evidence showed that termination of the parents' parental rights to C. N. I. was in the child's best interest. Evidence of the parents' parental misconduct or inability also supported the juvenile court's determination that termination of their parental rights was in C. N. I.'s best interest.[10] Moreover, the juvenile court was permitted to consider "the child's need for a stable home environment and the detrimental effects of prolonged foster care. Children need permanence of home and emotional stability or they are likely to suffer serious emotional problems."[11]

Upon the adjudication of deprivation, C. N. I. was placed in the same foster home with her siblings. Evidence showed that her foster parents loved her and her siblings, that she had bonded with her foster parents, and that they were interested in adopting the sibling group.

Furthermore, the guardian ad litem recommended termination, noting in particular that the parents had failed to establish adequate housing and stable income and that it was in the child's best interest

---

the Interest of H. D. T., supra at 866 (b); In the Interest of B. L. S., 239 Ga. App. 771, 774-775 (521 SE2d 906) (1999).

[7] In the Interest of B. L. S., supra at 775.

[8] See In the Interest of K. J., 269 Ga. App. 78, 83 (3) (603 SE2d 497) (2004); In the Interest of H. D. T., supra at 867 (c).

[9] See In the Interest of J. K., 278 Ga. App. 564, 566 (1) (629 SE2d 529) (2006) (recognizing that although the four factors determining parental misconduct or inability are separately listed in OCGA § 15-11-94 (b) (4) (A), "often they overlap, thus allowing evidence displaying one of the criteria to prove or at least partially prove one or more of the other criteria").

[10] See In the Interest of J. K., supra; In the Interest of K. J., supra at 83 (4) (same factors that show parental misconduct or inability may support a juvenile court's finding that termination of parental rights is in the child's best interest).

[11] In the Interest of B. L. S., supra at 775-776 (citation and punctuation omitted); see also In the Interest of K. J., supra at 83 (4).

to have stability in her life. A CASA representative agreed that parental rights termination was in the best interest of C. N. I., noting in particular the child's longtime placement and bonding with her siblings in their foster parents' home.

*Judgment affirmed. Ruffin, C. J., and Smith, P. J., concur.*

DECIDED JULY 6, 2006.

*Bryan C. Drost, Russell B. Lariscy, Jr.,* for appellants.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General, Gary H. Brakefield,* for appellee.