511 S.E.2d 895 (1999)
236 Ga. App. 312
In the Interest of C.S. et al., children.
No. A98A1671.
Court of Appeals of Georgia.
February 9, 1999.
*896 Linda R. Wells, for appellant.
Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Stephanie B. Hope, Assistant Attorneys General, Edea M. Caldwell, McDonough, for appellee.
ANDREWS, Judge.
Patricia Smith, the biological mother of C.S., J.S. and N.S., appeals from the juvenile court's order finding that her children were deprived and accepting the Department of Family & Children Services' (Department's) recommendation that reunification services were not appropriate. Finding no reversible error, we affirm the judgment of the juvenile court.
1. The mother argues on appeal that there was insufficient evidence to support the juvenile court's determination that reunification should not be attempted. OCGA § 15-11-41(i) provides that, "There shall be a presumption that reunification services should not be provided if the court finds by clear and convincing evidence that: (1) The parent *897 has unjustifiably failed to comply with a previously ordered plan designed to reunite the family; (2) A child has been removed from the home on at least two previous occasions and reunification services were made available on those occasions; (3) Any of the grounds for terminating parental rights exist, as set forth in subsection (b) of Code Section 15-11-81; or (4) Any of the circumstances set out in paragraph (4) of subsection (b) of this Code section exist, making it unnecessary to provide reasonable efforts to reunify."
Here, caseworkers testified to ten to thirteen years of involvement with the family. The children were finally removed permanently after Smith called a juvenile investigator from the sheriff's department and told her she wanted C.S., who was 12 at the time, out of her home. Smith said she had argued with C.S., and the investigator's notes showed that Smith had thrown C.S. down on the floor and spanked her "real hard." Smith said that she wanted to sign a complaint against C.S. and have her taken to the Youth Detention Center (YDC). Although Smith was "adamant" in wanting C.S. out of the house, the investigator did not think C.S. belonged in the YDC and talked Smith into keeping the child until she could be placed in the Children's Home.
The investigator said her next encounter with Smith was when she was called to the middle school after school personnel discovered bruises on J.S., C.S.'s younger sister, who was 11 at the time. J.S. said her mother had thrown her on the floor and hit her with a plastic stick. At this point, the investigator went to Smith's home to remove the children. When she arrived, C.S., J.S. and N.S., their two-year-old half-brother, were at home alone. The house was very dirty with things all over the floor and holes in the walls. The children were not clean.
When Smith arrived, she did not seem upset that the two girls were leaving, but when she realized N.S. was also being taken away, she began screaming and hollering at the girls that it was all their fault that she was losing the baby.
An investigator with the Clayton County Department testified that in August 1985, when J.S. was barely a year old, she was admitted to the hospital for malnourishment, anemia, and failure to thrive. J.S. remained in the hospital for three weeks, and Smith never called to inquire how she was.
C.S. was living with relatives at the time, and the Department removed J.S. from the home and devised a case plan for reunification; however, Smith's cooperation was "zero to minimal." The Department also assigned a family service worker to the home to help show proper parenting and housekeeping skills. This woman worked with Smith for two years, but Smith showed no improvement in interacting with the children or in housekeeping.
When C.S. was two and a half years old, she was put in a Head Start program. Smith agreed to pay $3 a week, and the Department would pick C.S. up and take her home. Records showed Smith sent her only about one day a week. At about this same time, when C.S. was two, the Department received unconfirmed allegations of child abuse.
The Department returned J.S. to her mother in October 1986. In January 1987, the Department received a fourth referral and again took J.S. out of the home. The investigator also testified that the children were absent or tardy numerous times and this ongoing truancy became such a problem that Smith was arrested because of it.
A counselor from the middle school said that when she first saw C.S., she was very withdrawn and would not communicate. But, in the past year C.S. had shown real improvement. She said C.S. told her that her mother beat her and she was also worried about her younger sister.
A caseworker testified that despite repeated attempts to convince Smith that she needed to make sure C.S. went to school, Smith refused to do so. C.S. had 27 absences in the 1996-1997 school year; however, since C.S. was placed in foster care she had not been absent from school and her verbal skills and attitude in general had improved. She stated that C.S. had not asked to go back to her mother.
*898 The caseworker said J.S. was also improving tremendously in foster care and her grades were better. J.S. also did not mention going back to her mother's home. Neither J.S. nor C.S. ever said they missed their mother and had "flourished" and "improved" in foster care.
Another counselor who had worked with the girls and Smith testified that in her opinion the girls did much better when they were not living with their mother and ought to remain out of the home.
The psychologist who evaluated the mother and both girls testified, stating that Smith had borderline personality disorders with moderate to severe psychosocial problems. He said that she denied responsibility, blamed other people and her children for problems and was not motivated to change. In his interviews with C.S. and J.S., they consistently described their mother as physically and verbally abusive. Both were very clear that they did not want to live with their mother. The psychologist stated that he did not believe the mother could give the two girls the environment or type of home they needed. He also said that as N.S. grows older, he would be at significant risk of undergoing the same treatment as C.S. and J.S. and he did not believe any of the children should live with Smith.
Another Department caseworker testified and said Smith attended six out of eighteen parenting classes, had almost finished her anger management classes, and, other than that, had not completed her case plan. She did not complete individual counseling as required by the case plan, did not pay the child support required, and did not make significant progress on any other requirements of the plan. The caseworker said nonreunification was recommended based on the number of times the girls had to be removed from the home.
Smith testified and said she wanted all her children back home. She admitted not complying with the case plan in the past, but said she was starting counseling and the anger management classes had helped her with her parenting skills.
When asked how she expected to support three children when she did not work, Smith replied, "I'm hoping to get a job."
The court found that the family's problems had been going on for ten to thirteen years and only in the past few weeks had Smith attempted to comply with any of the Department's requests. The children had been taken out of the home and put back several times, and the psychologist and all the caseworkers who testified recommended the children not be put back in Smith's home. Therefore, based on the numerous allegations of abuse, the length of time the problems had existed, and Smith's failure to attempt to make any changes, the court found it was in the best interest of the children to be settled in a stable environment and granted the nonreunification plan.
There was sufficient clear and convincing evidence from which the court could conclude that reunification services should not be provided. On appeal, "This Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's factfinding and affirm unless the appellate standard is not met." In the Interest of R. N., 224 Ga.App. 202, 480 S.E.2d 243 (1997). Here, the evidence showed that the children were deprived due to Smith's lack of parental care and the deprivation was likely to continue and cause serious harm to the children. There was evidence that Smith unjustifiably failed to comply with previous reunification plans, and the Department had to remove C.S. and J.S. from Smith's home numerous times. OCGA § 15-11-41(i). The court did not err in approving the nonreunification plan.
2. Smith also argues that the Department failed to comply with certain procedural requirements of OCGA § 15-11-41. OCGA § 15-11-41(c) provides that when the Department removes a child from the home, they must submit a written report to the court within 30 days. The contents of the report are to be determined at a meeting held by the Department with the citizens review panel and the parents. The parents shall be given written notice of the meeting at least five days in advance. OCGA § 15-11-41(c).
*899 Smith admits the written report was filed within 30 days, but contends that because it was withdrawn, it was as though it was never filed. Smith does not support the statement with any argument or citation to authority, and we find none.
Smith also argues that she was not given the requisite five days notice of the meeting. This argument was never made in the juvenile court and, therefore, cannot be raised on appeal. In the Interest of C. A., 225 Ga.App. 46, 48, 482 S.E.2d 534 (1997).
Next, Smith claims the Department redrafted the report to the court on the same day they mailed her notice of the meeting and then sent the report to the court before the scheduled meeting. There is no evidence of this in the record. An appellant has the burden of showing error by the record. Griffin v. Travelers Ins. Co., 230 Ga.App. 665, 666, 497 S.E.2d 257 (1998). Arguments made in briefs do not add evidence to the record and cannot be considered. Brown v. Thomas, 191 Ga.App. 679, 680, 382 S.E.2d 656 (1989).
Smith also argues the meeting was held outside the 30-day period provided by statute. The transcripts show the meeting was reset several times due to various conflicts, once because the guardian ad litem was ill and also apparently due to conflicts of Smith's own counsel. Although the procedural requirements of the juvenile court code have been held to be mandatory, such requirements can be waived. Sanchez v. Walker County Dept. of Family & Children Svcs., 237 Ga. 406, 408, 229 S.E.2d 66 (1976). Smith has not shown that it was the Department's fault that the hearing was held outside the statutory time frame. Counsel may agree to reset or postpone hearings. See id. There was no error.
3. In her last enumeration of error, Smith claims the trial court's order contained findings of fact which were not supported by the evidence. There is no merit to this enumeration.
Smith mistakenly claims the court found all of the children were removed from the home previously. The order does not state that fact. In addition, the juvenile court correctly found there was no relative placement available at the time without further evaluations.
There was also sufficient evidence to show N.S. was a deprived child. The Code defines a "deprived child" as "a child who: (A) Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health or morals...." OCGA § 15-11-2(8)(A). The evidence at the hearing describing the home life of all three children and Smith's failure to comply with the Department's requests was sufficient for the juvenile court to find that N.S. was a deprived child as defined by the statute.
Judgment affirmed.
POPE, P.J., and BEASLEY, P.J., concur.