546 S.E.2d 11 (2001)
248 Ga. App. 149
In the Interest of D.L.D. et al., children.
No. A01A0216.
Court of Appeals of Georgia.
February 20, 2001.
*12 Michael J. Tuck, Chatsworth, for appellant.
Thurbert E. Baker, Atty. Gen., Dennis R. Dunn, Deputy Atty. Gen., William C. Joy, Senior Asst. Atty. Gen., Shalen S. Nelson, Asst. Atty. Gen., Waycaster, Morris, Johnson & Dean, Cynthia N. Johnson, Dalton, for appellee.
JOHNSON, Presiding Judge.
The father of D.L. D., P.D.D. and N.L.D. appeals from a juvenile court order terminating his parental rights. In his sole enumeration of error, he contends the juvenile court did not have sufficient evidence to terminate his parental rights. We disagree and affirm the juvenile court's order.
Viewing the evidence in favor of the juvenile court's findings, the record shows that D.L.D. was born in April 1993, P.D.D. was born in August 1994, and N.L.D. was born in November 1996. In March 1994, the father and mother were arrested on drug charges, and the Whitfield Department of Family & Children Services (hereafter the "Department") sought temporary legal custody of D.L.D. The father and mother consented to the Department's temporary legal custody. Subsequently, the Department agreed to return D.L.D. to the mother with the condition that the father not be in the home because there had been domestic violence between the father and mother. In July 1994, D.L.D. was removed from the mother's home due to instability and domestic violence.
Approximately three weeks later, P.D.D. was born. Sometime between October and December 1994, D.L.D. was returned to the mother's home. However, both children were removed from the mother's home on December 29, 1994, due to the conditions in the household. The deprivation petition stated that the house was filthy, dishes were dirty, and the yard had an unpleasant odor. Case plans were developed, and the Department provided intensive reunification services, including over $4,000 in financial assistance, to help reunite the family. On February 19, 1996, the two children were returned to the father and mother, and the Department provided six months of monitoring supervision.
The Department did not have any further involvement with the family until November 8, 1999, when it received a referral that the mother and father were using drugs, that the parents had separated, and that the children were truant from school and had lice. The Department substantiated the report of neglect and learned that a truancy petition had been filed by the school system. In addition, both parents tested positive for illegal drugs. The children were then placed in the Department's temporary legal custody. The Department developed a case plan for the parents, as well as an alternative nonreunification case plan because of the family's extensive involvement with the Department. The mother failed to comply with the case plan terms, and the father was incarcerated on February 1, 2000, for possession of methamphetamine *13 with intent to distribute and being an habitual violator.
On April 24, 2000, the Department filed a petition to terminate parental rights and a motion to cease reunification efforts. On May 23, 2000, the juvenile court conducted a hearing on the petition and motion. Nine witnesses, including the father, testified.
Two caseworkers with the Department testified about the Department's involvement with the family, the family's living conditions (which included an unfurnished trailer heated only by kerosene), and the drug test results. The technician who conducted the father's drug test testified that he ran two tests and both tests were positive for illegal drugs.
Another caseworker with the Department testified that other than two visits prior to his incarceration, the father's only contact with the children were his attempts to place collect phone calls to the home where they were staying. He did not send the children letters and had not paid any child support. She recounted that in the two visits the father had prior to his incarceration, the children were happy, interacted with the father, exhibited no behavioral problems, and cried when the visits ended. She opined that the children appeared to have bonded with the father. She further reported that in the past few weeks D.L.D. had become uncontrollable and that all the children were going to receive counseling. In her opinion, even if the parents had attempted to comply with the Department's case plan goals, the Department would still be concerned based on the family's past history and the parents' instability, drug abuse, failure to maintain a permanent and adequate home, and lack of stable employment.
A social worker with the Whitfield school system testified that from August 1999 to January 2000, D.L.D. attended four different schools, was not enrolled in any school on two different occasions, and was absent or not enrolled for a total of 49 days. During the same period, P.D.D. had attended two different schools and was either absent or not enrolled for a total of 35 days. The social worker stated that she had been unable to contact the parents and that the children's learning and developmental skills were adversely affected by their excessive absences from school. A social worker with the Murray school system testified that during the 1998-1999 school year, D.L.D. missed 28 days of school and that she attempted to investigate the reasons for the absences. She visited the family's home and talked to the mother, but then the family disappeared.
The mother testified that the father was a good father and denied that their relationship was violent. However, she also admitted the police were called to the family's residences because of domestic disputes. She further acknowledged that she had lived in eight different places in the past two to three years, that she had not lived in any one place for more than a year, that she had failed to maintain employment, and that she had a drug problem. According to the mother, the father could care for the children properly, loved the children, and never abused them. She reported, however, that the father had not paid child support while the children were in the Department's custody and that he had been incarcerated for about nine months of both D.L.D.'s and P.D.D.'s lives and four months of N.L.D.'s life.
The father testified that he was the father of all three children and had two other children who were in the custody of his former sister-in-law. He recounted that he was first arrested and convicted in 1988 on a forgery charge and spent ten months in jail following his conviction for a probation violation. He pled guilty to a charge of possession with intent to distribute marijuana in 1994 and was released from prison on that charge in 1995. He testified that at the time of the hearing he was incarcerated for convictions of possession of methamphetamine with intent to distribute and of being an habitual violator, although he would be out of prison in 90 days after completing boot camp. The father maintained that he planned to stay out of trouble once he was released from prison.
The father described his sporadic work history. He maintained that although he graduated from high school and took one year of college courses in computer technology, he was denied employment in that field *14 because of his criminal background. He conceded that the family had moved "several times" in the last five years. He also acknowledged that he and the mother had been unstable, had used drugs over the years, and had done some things they should not have done. He offered no excuse for the positive drug test in December 1999, and testified that he had not seen his children since January 2000. According to the father, he loves the children very much, wants another chance to parent them, and thinks he could do a better job this time.
The children's guardian ad litem recommended that the juvenile court terminate the mother's parental rights. However, he was equivocal in his remarks concerning the father. While he believed clear and convincing evidence had been presented showing that the children were deprived due to the actions of both parents, he was sympathetic to the father and believed the father deserved another chance.
On appeal, we view the evidence in a light most favorable to the juvenile court's order and determine whether a rational trier of fact could have found by clear and convincing evidence that the parent's rights should have been terminated; we do not weigh the evidence and must defer to the trial judge as the factfinder.[1]
The decision to terminate parental rights involves a two-step process. First, the juvenile court must determine whether there is clear and convincing evidence of parental misconduct or inability, as defined in OCGA § 15-11-94(b). Parental misconduct is found when the child is deprived, the cause of the deprivation is lack of proper parental care or control, the cause of the deprivation is likely to continue or will not likely be remedied, and the continued deprivation will cause or is likely to cause serious harm to the child.[2] Second, if the juvenile court finds clear and convincing evidence of parental misconduct or inability, it must consider whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.[3]
In the present case, the father asserts that the juvenile court erred in terminating his parental rights because there was insufficient evidence of parental misconduct or inability. However, we find clear and convincing evidence warranting the termination of his parental rights.
No question exists that the children were deprived. Prior orders finding the children deprived were not appealed, and the juvenile court took judicial notice of these orders. Accordingly, the father is bound by the juvenile court's prior finding of deprivation.[4]
Other evidence supports the juvenile court's determination that the remaining requirements of OCGA § 15-11-94(b)(4)(A) were established. Testimony at the hearing established that the children's deprivation was caused by the father's conduct. His incarcerations and his criminal record have affected his ability to properly parent and provide for his children. In fact, the father contends that his criminal record is a cause of his failure to obtain full-time employment. He further contends that the children's truancy problems are a result of his incarcerations. The truancy problems are also a result of the family's nomadic lifestyle, including the father's attempts to run from the law before his arrest in June 1999. In determining whether the cause of the deprivation was lack of proper parental care or control, the juvenile court was authorized to consider the father's records of multiple convictions for felonies and periods of imprisonment, which had a demonstrable negative *15 effect on the quality of his relationship with the children.[5]
The father argues that there is insufficient evidence showing that the children's deprivation is likely to continue. However, it is well established that evidence of past conduct may be considered in determining whether the deprivation is likely to continue if the children are returned to the father.[6] The past conduct of the father in this case certainly justifies such a finding. Where a parent has a history of drug abuse problems, the court may consider that history in determining whether the children are without the proper care and control and whether the deprivation is likely to continue.[7] The father failed to remain drug free, failed to remain out of jail, failed to obtain stable employment, and failed to provide a stable home. While we recognize that the father sincerely loves his children and has bonded with them, we must conclude, based on the evidence, that a rational trier of fact could have found by clear and convincing evidence that the children's deprived conditions were likely to continue. Under these circumstances, we must also conclude that there was sufficient evidence to support the juvenile court's finding that the continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the children.
The evidence was also sufficient to show under OCGA § 15-11-94(a) that termination of the father's parental rights was in the best interests of the children, considering the physical, mental, emotional, and moral needs of the children and the children's need for a stable and secure home. The same factors that show the existence of parental misconduct or inability can also support a finding that the termination of the parental rights would be in the children's best interests.[8] In this regard, our review of the entire record shows that there was sufficient clear and convincing evidence to support the juvenile court's finding that the termination of the father's parental rights would be in the children's best interests.
While the father promises to change his life, this Court has repeatedly recognized that "[t]he decision as to a child's future must rest on more than positive promises which are contrary to negative past fact."[9] Based on the father's past behavior, the length of time his problems have persisted, and his own admissions, the juvenile court did not err in terminating his parental rights.
Judgment affirmed.
RUFFIN and ELLINGTON, JJ., concur.
NOTES
[1] In the Interest of D. L. N., 234 Ga.App. 123, 125(2), 506 S.E.2d 403 (1998).
[2] OCGA § 15-11-94(b)(4)(A).
[3] OCGA § 15-11-94(a); In the Interest of B. D., 236 Ga.App. 119, 511 S.E.2d 229 (1999).
[4] In the Interest of L. H., 236 Ga.App. 132, 133-134, 511 S.E.2d 253 (1999); In the Interest of E. C., 225 Ga.App. 12, 14-15, 482 S.E.2d 522 (1997).
[5] See In the Interest of F. C., 239 Ga.App. 545-546, 521 S.E.2d 470 (1999).
[6] See In the Interest of B. D., supra at 121(2), 511 S.E.2d 229.
[7] See In the Interest of J. M. D., 221 Ga.App. 556, 558, 472 S.E.2d 123 (1996).
[8] In the Interest of C. N. H., 238 Ga.App. 50, 53-54(2), 517 S.E.2d 589 (1999).
[9] (Citation and punctuation omitted.) In the Interest of S. J. C., 234 Ga.App. 491, 494(1), 507 S.E.2d 226 (1998).