597 S.E.2d 537 (2004)
266 Ga.App. 434
In the Interest of T.D.B. et al., childern.
No. A03A1746.
Court of Appeals of Georgia.
March 23, 2004.
*538 Sheryl D. Fambrough, Monroe, for appellant.
Thurbert E. Baker, Attorney General, William C. Joy, Senior Assistant Attorney General, John R. Laseter, Shalen S. Nelson, Laura W. Hyman, Assistant Attorneys General, Melissa A. Bruzzano, for appellee.
MIKELL, Judge.
Appellant mother appeals three juvenile court orders extending the placement of her four minor children in the custody of the Walton County Department of Family and Children Services ("Walton DFCS"), terminating her parental rights, and finding that no suitable relative placement exists. We affirm.
"On appeal, this [C]ourt neither weighs the evidence nor determines the credibility of witnesses; we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met." (Citation omitted.) In the Interest of R.U., 239 Ga.App. 573, 577(1), 521 S.E.2d 610 (1999).
Viewing the evidence in favor of the juvenile court's findings, the record shows that in the ten years preceding the case at issue, appellant's family received assistance from Departments of Family and Children Services ("DFCS") in at least four other counties. The present case involves four of the appellant's children: T.D.B., born January 20, 1993, J.L.B., born October 3, 1994, G.C.B., born February 1, 1996, and A.L.B., born August 15, 1997.[1] The incident leading to the children's most recent removal from the home occurred on July 30, 2001, when appellant took the children to the Walton DFCS office and reported that their father had threatened to kill them. The caseworkers who met with the family observed that the children were filthy, were not properly dressed, and had strong body odor. There was also evidence that they were infested with lice. Appellant told one of the caseworkers that she wanted Walton DFCS to protect the children.
Appellant appeared to be under the influence of drugs, and she admitted that she had taken Vicodin and a muscle relaxant. She told the caseworker that she needed mental health treatment and that she had not taken her prescribed antidepressant since December 2000. When appellant learned that Walton DFCS intended to obtain temporary custody of the children, she threatened to kill herself. She was taken to a hospital, and *539 Walton DFCS obtained emergency custody of the four children and R.L., appellant's child from a previous marriage.
The juvenile court held a detention hearing on July 31, 2001, and entered a detention order on August 2, 2001. On or about August 6, 2001, Walton DFCS filed a deprivation petition and an affidavit of reasonable efforts to preserve and reunify the family. The court held an adjudicatory hearing on August 16, 2001, and entered a deprivation order on September 5, awarding Walton DFCS temporary custody of T.D.B., J.L.B., G.C.B., and A.L.B. The court awarded custody of R.L. to her father. The deprivation order was not appealed.
Walton DFCS subsequently developed a nonreunification case plan for the family, which was filed on November 14, 2001, and incorporated by the court as part of the dispositional order on November 15. A citizens review panel met on December 4, 2001, and recommended termination of parental rights. Appellant subsequently requested a hearing on the panel's recommendation.
On December 11, 2001, Walton DFCS filed a petition to terminate the parental rights of appellant and the children's father. The family's caseworker prepared a detailed report which was attached as an exhibit to the petition, describing ten years of severe neglect and abuse suffered by appellant's children. The parties consented to consolidation of the nonreunification hearing and the termination hearing. Walton DFCS amended the petition to add certificates from the putative father registry indicating that no one acknowledged paternity of T.D.B., J.L.B., G.C.B., and A.L.B.
The consolidated hearing took place on March 4 and 5, 2002. The juvenile court heard testimony from seven caseworkers about appellant's history of involvement with DFCS offices in five counties in Georgia. Valerie McKenzie and Aileen Blacknell of Cobb DFCS testified that their office received eight neglect referrals on appellant's family between February 1991 and November 1999; that they implemented five case plans for the family; and that they assisted appellant with problems including deplorable living conditions, inadequate food supply, deficient medical care, truancy, and inappropriate discipline. According to Blacknell, Cobb DFCS would have sought a shelter care order to remove the children had appellant's lack of cooperation continued. Instead, the case was transferred and closed when the family moved to Kentucky in April 1999.
Ramona Duncan, a Bartow DFCS investigator, testified that her agency received four neglect reports on appellant's family between June 1995 and November 1998. The evidence showed that while in Bartow County, appellant's family lived in campground tents, a van, and a dirty, roach-infested home. Bartow DFCS developed a safety plan for appellant and attempted to assist her with some of the same problems encountered in Cobb County, including housing, hygiene, and food supply.
Margarita Shaw, a Newton DFCS caseworker, testified that her agency received five referrals on appellant's family from April 2000 through February 2001. She testified that in August 2000, Newton DFCS received reports that the family was living in a tent in a park and that appellant and the children's father were smoking marijuana. After appellant tested positive for marijuana, Newton DFCS obtained temporary custody of the children. After appellant and the father complied with the goals of their reunification plan, the children were returned home on October 12, 2000.
Penny Shirley, a caseworker with Walton DFCS, testified that her office first received a referral on appellant's family in February 2001, but that the case was transferred to Newton DFCS. She testified that she encountered the family again on July 30, 2001, when the children were removed after appellant brought them to the Walton DFCS office. Shirley went to the appellant's home that day, and she testified that the living conditions she encountered were deplorable; there was rotten food in the kitchen; the bathtub was filled with wet and dirty clothes; there were more wet, moldy clothes on the back porch; and there were no sheets on the beds. She opined that the house was not suitable for humans to inhabit and that it should have been condemned. According to *540 Shirley, the father told her that he had been living at a motel because of the condition of the home.
Amber Gray, a Walton DFCS caseworker, and Eugenia Whitted, an Oglethorpe DFCS case manager, testified about appellant's visitation with the children. Both reported that appellant had very limited interaction with the children and that she often watched the children play with their father while she talked to the caseworkers about her problems.
Appellant's oldest child and the children's half-brother, Ro.L., who was 18 years old at the time of the hearing, testified that appellant had beaten him and that the children's father molested him.[2] He further testified that he had bipolar disorder and was previously diagnosed with paranoid schizophrenia. Ro.L. testified that he had attempted suicide twice, was under the care of a psychiatrist, and took medication daily. When asked about his childhood, Ro.L. told the court that "I didn't have very much of a place to live because I was always getting kicked out. The water would be getting shut off. The house would be messed up." He alleged that appellant tried to kill T.D.B. when he was a baby by putting a pillow over his face. Ro.L. further testified that appellant was homeless at the time of the hearing; that she used illegal drugs; that he saw her smoking crack in the months before the hearing; and that he and R.L. had smoked marijuana with appellant, who supplied him with drugs. There was evidence that at age 13, Ro.L. was arrested and sent to a youth detention center because he molested J.L.B. and that T.D.B. witnessed the attack and reported that he had also been molested by Ro.L.
The record contains evidence of the children's special needs. The Transitional Family Services Placement Assessment documents that all four children were lice-infested when they were taken into Walton DFCS custody, that they had a history of malnourishment and dental problems, and that all four had lead poisoning in the past. T.D.B. was diagnosed with "depressive disorder" and mild mental retardation. The report states, in part: "[T.D.B.] presents himself as a very guarded and depressed person, who appears to have lost hope and `never trusts anyone.'" At the time of the hearing, T.D.B. was nine years old but in the first grade. Whitted testified that T.D.B. was removed from his foster home on February 20, 2002, because he exhibited inappropriate sexual behavior.
The other three children also had significant mental and emotional problems. J.L.B. was diagnosed with "chronic adjustment disorder" with mixed anxiety and depressed mood. She was seven years old but in kindergarten. G.C.B. was diagnosed with "adjustment disorder" with mixed disturbances of emotions and conduct, with borderline intellectual functioning. She was removed from her foster home in February 2002 due to aggressive behavior. A.L.B., the youngest child, was diagnosed with "adjustment disorder" with depressed mood.
In connection with the assessment, a therapist evaluated appellant's mental health and substance abuse problems. Appellant told the therapist that she suffered from depression and anxiety attacks. The therapist determined that appellant also abused drugs. The record shows that appellant failed drug screens in August 2000, February 2001, and August 2001. In 2000, she attended 7.5 hours of a 30-hour substance abuse program.
In the assessment, the therapist concluded that the children required a safe, supportive, structured environment that appellant was unable to provide and recommended that they be placed together in a foster home or with a relative. At the time of the hearing, all of the children were receiving psychological treatment, and G.C.B. was taking medication.
After closing arguments, the guardian ad litem recommended that the juvenile court terminate the parental rights of appellant and the father. At the close of the hearing, the court pronounced its ruling approving nonreunification, terminating the parental rights of both parents, and finding that there was no suitable relative placement available.
*541 On July 16, 2002, Walton DFCS filed a motion for extension of custody and a motion for hearing pursuant to OCGA § 15-11-103. After conducting a hearing, the court signed an order on August 5 extending Walton DFCS's custody. On that date, the court also signed an order concluding that there was no suitable relative placement available and awarding permanent custody of the children to Walton DFCS for the purpose of adoption. The orders were filed on December 12, 2002. Also on that date, the court filed an order memorializing its ruling that the nonreunification plan was approved and the parental rights of appellant and the father were terminated.[3]
1. In two related errors, appellant challenges the juvenile court's termination of her parental rights. For the reasons that follow, we affirm.
OCGA § 15-11-94(a) sets out a two-part procedure for termination cases. First, the juvenile court must determine whether there is clear and convincing evidence of parental misconduct or inability, as defined in subsection (b) of the statute. Parental misconduct is found when: (1) the children are deprived; (2) lack of proper parental care or control is causing the deprivation; (3) the cause of the deprivation is likely to continue or will not likely be remedied; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the children. OCGA § 15-11-94(b)(4)(A)(i)-(iv). Second, if the juvenile court finds clear and convincing evidence of parental misconduct or inability, "[it] shall then consider whether termination of parental rights is in the best interest[s] of the [children], after considering the physical, mental, emotional, and moral condition and needs of the [children] ..., including the need for a secure and stable home." OCGA § 15-11-94(a). See In the Interest of D.L.D., 248 Ga.App. 149, 152, 546 S.E.2d 11 (2001). Appellant does not dispute that her children were deprived, the cause of the deprivation, or that continued deprivation would cause serious harm to the children. Rather she challenges only the court's findings that the deprivation is likely to continue and that termination of her parental rights is in the children's best interests.
(a) First, appellant argues that the juvenile court erred in finding clear and convincing evidence that the cause of the children's deprivation was likely to continue or would not likely be remedied. OCGA § 15-11-94(b)(4)(A)(iii). She contends on appeal that she completed the goals of her previous case plans and that she is prepared to provide a suitable home for her children; however, "judging the credibility of her good intentions was a task for the juvenile court." In the Interest of N.M.H., 252 Ga.App. 353, 356, 556 S.E.2d 454 (2001).
Significantly, in determining whether conditions of deprivation are likely to continue, the juvenile court was authorized to consider the ten-year history of neglect suffered by appellant's four children. See In the Interest of R.W., 254 Ga.App. 34, 36(2)(a)(iii), 561 S.E.2d 166 (2002). The voluminous record is replete with evidence of appellant's continued problems with unsanitary living conditions, homelessness, drug use, mental illness, and emotional difficulties. This Court has held:
The court can consider a parent's past conduct in determining whether such conditions of deprivation are likely to continue. Where the evidence shows that after instances of cleanliness the parents repeatedly allow the home to revert to a filthy and unsanitary condition, a rational trier of fact could reasonably conclude that these unhealthy conditions would continue.
(Citations and punctuation omitted.) In the Interest of H.H., 257 Ga.App. 173, 176(1)(a), 570 S.E.2d 623 (2002). The juvenile court is not required to reunite the children with appellant in order to obtain current evidence of deprivation or neglect. In the Interest of N.M.H., supra. Furthermore, appellant presented no evidence that she had obtained mental health or substance abuse treatment since the removal of her children. In fact, *542 there was evidence that appellant continued to use illegal drugs. "The decision as to a child's future must rest on more than positive promises which are contrary to negative past fact." (Citation and punctuation omitted.) In the Interest of M.L.P., 236 Ga.App. 504, 509(1)(c), 512 S.E.2d 652 (1999). The evidence presented supports the juvenile court's finding that it is very likely that the deprivation of the children will continue.
(b) Next, appellant assigns error to the court's finding that termination of her parental rights is in the children's best interests. OCGA § 15-11-94(a). Again, her argument is unsuccessful. "The same factors which show the existence of parental misconduct or inability can also support a finding that termination of parental rights would be in the best interest[s] of the [children]." (Punctuation and footnote omitted.) In the Interest of N.M.H., supra at 358, 556 S.E.2d 454. The court may also consider the children's need to live in a safe and stable environment. In the Interest of R.W., supra at 37(2)(b), 561 S.E.2d 166.
There was ample evidence to support the court's finding that termination was in the children's best interests, including the family's history of instability, the fact that the children have lived in filth for their entire lives, their developmental and emotional problems, and evidence of malnourishment and poor hygiene. Because the court's decision that appellant's parental rights have been lost is supported by clear and convincing evidence, we affirm.
2. Appellant contends that the juvenile court erred in finding that Walton DFCS performed an exhaustive and thorough search for relative placement as required by OCGA § 15-11-103(a)(1). We disagree.
The evidence presented at the consolidated hearing belies appellant's argument. The record shows that both parents provided the Transitional Family Services therapist with names of extended family members, but they did not recommend any of them as placement options. Gray testified that she asked both parents to provide names of family members who would be willing to care for the children but neither parent gave her any names. Appellant admitted during her testimony that she did not furnish Walton DFCS with any names of potential placement options. At the close of the consolidated hearing, the court concluded that the requirements of OCGA § 15-11-103(a) had been satisfied and that it was not in the best interests of the children to be placed with a relative.
Nevertheless, the court heard additional evidence regarding this issue at a hearing on August 5, 2002, after giving the parties and Walton DFCS approximately five months to search for a relative placement. At the hearing, the father testified that there were no relatives on his side of the family willing to care for the children. The appellant's mother was briefly considered; however, she was found not to be a suitable placement due to "mental health issues, glue sniffing, and no bond with the children." The court issued an order finding no suitable family member with whom the children could be placed. Appellant has provided no basis for disturbing that order.
3. In three enumerated errors, appellant assigns error to the juvenile court's approval of the nonreunification of appellant's family. Finding no error, we affirm.
(a) First, appellant contends that the trial court erred in approving the nonreunification plan because Walton DFCS made no reasonable efforts to reunify the family as provided by OCGA § 15-11-58(a). However, reunification services are not always required. Subsection (h) of that statute provides that
the court shall determine by clear and convincing evidence whether reasonable efforts to reunify a child with his or her family will be detrimental to the child and that reunification services, therefore, should not be provided or should be terminated. There shall be a presumption that reunification services should not be provided if the court finds by clear and convincing evidence that: ... (3) Any of the grounds for terminating parental rights exist, as set forth in subsection (b) of [OCGA §] 15-11-94.
In Division 1 of this opinion, we held that the court's decision to terminate appellant's *543 parental rights was supported by clear and convincing evidence. Accordingly, there was a presumption that reunification services should not be provided to this family. See generally In the Interest of R.U., supra at 576(1), 521 S.E.2d 610. The record summarized above provides clear and convincing evidence to support the court's determination that appellant failed to rebut the presumption and that efforts to reunify the children with the appellant would be detrimental to them. See OCGA § 15-11-58(h).
(b) Next, appellant argues that the court erred in approving the nonreunification plan because Walton DFCS's report failed to comply with the requirements of OCGA § 15-11-58(f). However, appellant raises this argument for the first time on appeal. "This argument was never made in the juvenile court and, therefore, cannot be raised on appeal." (Citation omitted.) In the Interest of C.S., 236 Ga.App. 312, 315(2), 511 S.E.2d 895 (1999).
(c) Similarly, appellant's argument that the juvenile court erred by failing to hold a hearing within 30 days of the filing of the nonreunification report as required by OCGA § 15-11-58(e) has been waived. Appellant agreed to consolidate the nonreunification and termination proceedings. Therefore, she has waived any statutory requirements as to the timing of the hearing and cannot challenge the procedure for the first time on appeal. In the Interest of A.S.O., 243 Ga.App. 1, 4(2), 530 S.E.2d 261 (2000).
4. Appellant argues that the trial court erred in considering hearsay evidence during the consolidated hearing; however, this argument is without merit. Appellant refers to three instances where caseworkers attempted to testify from reports prepared by other caseworkers. In the first instance cited by appellant, the court sustained appellant's hearsay objection. Likewise, in the next instance, on appellant's objection, the court instructed the witness to testify only "to what you know of your own knowledge." Finally, in the third instance, the court noted that it would be able to separate hearsay testimony from admissible evidence and allowed the witness to testify generally about two referrals to Cobb DFCS.
In fact, the court told the parties several times during the hearing that it would be able to separate hearsay from non-hearsay testimony, and that it would assign no weight to hearsay, regardless of whether there was an objection. OCGA § 15-11-56(a) provides that in proceedings involving the custody of children, "all information helpful in determining the questions presented, including oral and written reports, may be received by the court and relied upon to the extent of its probative value." This Court has held that "[d]uring a nonjury trial, it is presumed that the court is able to sift the wheat from the chaff and select only the legal evidence. We will reverse the trial court only where there is no legal evidence to support the trial court's ruling." (Punctuation and footnotes omitted.) In the Interest of C.G.B., 242 Ga.App. 705, 711(4), 531 S.E.2d 107 (2000). Here, there was ample admissible evidence supporting the juvenile court's judgment. Therefore, we find no reversible error.
5. Finally, appellant contends that the juvenile court erred in considering hearsay evidence in the form of the guardian ad litem's report. This argument is without merit, as the court expressly told the parties: "The Court is not going to give any credence to the Guardian Ad Litem's report. That would be hearsay testimony." Accordingly, we affirm.
Judgment affirmed.
JOHNSON, P.J., and ELDRIDGE, J., concur.
NOTES
[1] The appellant has two other children from a previous marriage who are not subject to the appealed orders: Ro.L., born April 22, 1983, and R.L., born February 9, 1985.
[2] Both appellant and the children's father denied the molestation allegation; however, appellant admitted that Ro.L. was molested by a grandfather.
[3] The father filed a motion to vacate the oral ruling terminating his parental rights on August 13, 2002, asserting that Ro.L. had recanted his testimony that the father molested him and used drugs; however, he withdrew his motion on March 28, 2003, and did not appeal the final termination order.