601 S.E.2d 409 (2004)
268 Ga. App. 32
In the Interest of J.P. et al., children.
No. A04A0695.
Court of Appeals of Georgia.
June 18, 2004.
*410 James Anagnostakis, Douglasville, for Appellant.
Thurbert Baker, Attorney General, Shalen Nelson, Assistant Attorney General, William Joy, Senior Assistant Attorney General, Laura Hyman, Assistant Attorney General, T. Flinn, Law Offices Of T. Michael Flinn, Carrollton, for Appellee.
MIKELL, Judge.
J.P., the biological father of Ju.P. and Je.P., appeals the juvenile court's order terminating his parental rights and awarding custody to the Carroll County Department of Family and Children Services ("DFCS"). For the reasons set forth below, we affirm.
On appeal from a termination order, this Court views the evidence in the light most favorable to the appellee and determines whether "any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost."[1] "We do not weigh *411 the evidence and must defer to the trial judge as the factfinder."[2] So viewed, the evidence shows that on January 17, 2001, DFCS obtained emergency custody of Ju.P., who was six months old. The infant was living with his parents and two half-siblings in a shack that had no heat, running water, or bathroom facilities. Marijuana was found in the shack, and the parents tested positive for marijuana use. After a hearing held on January 26, 2001, the juvenile court entered an order adjudicating the child deprived, pursuant to his parents' stipulation, and awarding temporary custody to DFCS. A DFCS case review revealed that the child suffered from numerous medical problems, including fetal alcohol syndrome, reactive attachment disorder, post-natal neglect, developmental delays, and asthma. According to his foster mother, the back of Ju.P.'s head was flat when he first came into her care, and a neurosurgeon fitted him with a cranial helmet for six months to correct the problem. Apparently the problem was caused by his parents leaving him lying on his back for extended periods of time.
DFCS developed a reunification case plan on April 25, 2001, requiring appellant to learn and demonstrate parental skills needed to meet Ju.P.'s medical and emotional needs; maintain stable housing and employment; remain free of drugs and alcohol; maintain an attachment with the child; and legitimate him. On December 4, 2001, DFCS filed a motion to adopt a plan for nonreunification, alleging that both parents had failed to comply with their case plans.
Three weeks later, on December 27, 2001, Je.P. was born. DFCS opened a case file on the child and continued to provide services to the family so that he could remain in the home. Ju.P. remained in DFCS custody, and additional case plans, which were reviewed by citizen panels and incorporated by court orders, were implemented. The panels did not recommend reunification. DFCS filed a petition to terminate parental rights to Ju.P. on January 2, 2003, but later withdrew the petition to permit additional reunification efforts. The parents were required to meet specific goals, including remaining free of drugs and alcohol. However, one month later, the mother tested positive for methamphetamine. DFCS then filed a petition alleging that Je.P. was deprived. The juvenile court held a hearing, adjudicated the child deprived, and ordered that he be placed into DFCS custody as well. He came into DFCS's care on February 21, 2003. DFCS developed a nonreunification case plan for both children, which was incorporated by court order on May 19, 2003. The children's court-appointed special advocate recommended termination of parental rights.
DFCS filed a petition to terminate parental rights to both children on July 1, 2003. The hearing was held in September. The mother did not attend. Appellant arrived two hours late and did not testify. DFCS intended to call as its first witness the psychologist who evaluated appellant, but the parties stipulated to the admissibility of her report. In the report, the psychologist expressed concern about appellant's history of marijuana and alcohol abuse, noting that he was evaluated at a substance program and that treatment was recommended. However, appellant failed to follow through with treatment. In addition, the psychologist reported that appellant denied the existence of a problem and claimed to be in full remission. The psychologist also expressed concern that appellant lacked basic parenting skills but claimed that he was fully aware of how to tend to Ju.P.'s medical needs. This expert noted that appellant tended to rationalize. For example, he pleaded guilty to aggravated battery in July 2001 for breaking the mother's jaw, but did not seem to believe that he assaulted her. Also, a drug screen performed in 2002 showed that appellant had ingested methamphetamine, but he attributed the test result to medication.
DFCS's first witness, Beth McGahee, was assigned to Ju.P.'s case on February 1, 2003, after the parents requested a new caseworker. She testified that she created a new case plan with the parents, but appellant indicated *412 that he had no desire to work on another plan. Appellant did submit to a drug test, which was negative. McGahee further testified that she visited the home while Je.P. lived there, and although there was a space heater in the living area, it was very cold in Je.P.'s bedroom. In addition, there was no milk or formula in the home, and the food in the refrigerator was uncovered.
McGahee further testified that she arranged for appellant to obtain substance abuse treatment free of charge, but he did not avail himself of this opportunity. McGahee detailed appellant's noncompliance with the goals of his case plan, including his failure to attend Ju.P.'s medical appointments, to call the caseworker to inquire about Ju.P.'s health, or to cooperate with child support enforcement. Appellant appeared in her office in August and expressed his belief that he had completed all of the goals on his case plan. McGahee believed that it would be harmful to the children to be returned to their parents, primarily because neither parent had shown any interest in the children's medical needs and because of their failure to maintain stable housing. She further testified that the children have thrived in foster care. Finally, McGahee noted that DFCS had been unable to pursue relative placement because the only relative suggested by the parents was the paternal grandfather, who was not willing to take custody of the children.
Amanda Stephens, a visitation coordinator, testified that the parents visited Ju.P. regularly until June 2002, then sporadically through August 2002, when they stopped altogether for three months. However, she also stated that appellant had visited the children regularly in the five months preceding the hearing, especially since separating from the mother.
The children's foster mother recounted Ju.P.'s extensive history of physical and behavioral difficulties. She testified that when Ju.P. came into her care, the child was filthy, the back of his head was flat, and his sleeper pajamas were so small that his toes were curled and his skin was imprinted with lines from the seams. Moreover, the child suffered from asthma, ear infections, gastric reflux, and he was lethargic and unresponsive to stimuli. She testified that his current behavioral problems included tantrums, beating his head against the wall, biting himself and others, and pulling his genitals, and that Ju.P. is under professional care for the problems. The witness estimated that, since coming into her care, Ju.P. had visited various physicians 90 times. In addition, she testified that after visitation with his father, the child becomes agitated to the extent that his temper tantrums intensify for as many as nine days, and he wakes up during the night crying out for his foster mother.
The foster mother also testified to the problems Je.P. had when he first came into her care. He was quiet, withdrawn, and over-ate to the point of vomiting. He suffered from ear infections and asthma, which continue to require medication and breathing treatments. She indicated that neither parent ever appeared for Je.P.'s doctor's appointments. Finally, the foster mother testified that both children were well integrated into her family and that she desired to adopt them.
Appellant did not testify, and his sole witness was his father, M.P. M.P. testified that he would like to share custody of the children with his son but was not willing to do it alone. He testified that his son had been working for him for three years and no longer used marijuana. The guardian ad litem did not recommend termination of appellant's parental rights, although he gave no reasons for his opinion. After considering all of the evidence, the juvenile court terminated appellant's and the mother's parental rights. The mother does not appeal.
1. OCGA § 15-11-94(a) sets out a two-part procedure for termination cases. First, the juvenile court must determine whether there is clear and convincing evidence of parental misconduct or inability, as defined in subsection (b) of the statute. Parental misconduct is found when: (1) the children are deprived; (2) lack of proper parental care or control is causing the deprivation; (3) the cause of the deprivation is likely to continue or will not likely be remedied; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or *413 moral harm to the children.[3] Second, if the juvenile court finds clear and convincing evidence of parental misconduct or inability, "[it] shall then consider whether termination of parental rights is in the best interest of the [children], after considering the physical, mental, emotional, and moral condition and needs of the [children] ..., including the need for a secure and stable home."[4]
Appellant does not challenge the juvenile court's finding that the children were deprived. In this regard, we note that the juvenile court adjudicated the children deprived in numerous, unappealed dispositional orders. Accordingly, appellant "is bound by this finding of deprivation and the first factor is satisfied."[5] However, appellant enumerates as error the juvenile court's findings as to the second, third, and fourth factors of the first prong of the test.
(a) Our review of the juvenile court's finding as to the second criterion, that lack of proper parental care or control caused the deprivation, is limited to appellant's sole argument that the court relied entirely on evidence of past unfitness. Appellant correctly asserts that "evidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in [his] natural child; clear and convincing evidence of present unfitness is required."[6] However, contrary to appellant's contention, the juvenile court's order recounts clear and convincing evidence of present unfitness, including the conclusions drawn by the psychologist who evaluated appellant two weeks prior to the hearing, as well as evidence of appellant's continuing failure to attend the children's medical appointments, his refusal to work on his case plan, his refusal to obtain recommended treatment for substance abuse, and his failure to maintain stable housing. As the court relied on evidence of present unfitness, this enumerated error fails.
In a related enumeration of error, appellant contends that the court fatally erred in failing to consider factors outlined in OCGA § 15-11-94(b)(4)(C). When the children are not in a parent's custody, this Code section requires the juvenile court to consider whether the parent failed significantly, for at least one year before the termination petition was filed, to maintain a meaningful, supportive parental bond with the children, to support the children financially, or to comply with the court-ordered reunification plan.[7] It is undisputed that appellant did not support his children as required by law, and the court expressly so found. "A father's failure to support his child, even in the absence of an order directing the father to pay a specific amount for the child's support, is compelling evidence that the father is not an able parent."[8] Moreover, the caseworker's testimony, as recounted above, supports the court's findings that, although appellant attended some parenting classes, he failed to comply with other elements of his case plan, particularly the need to maintain stable, appropriate housing or to attend the children's medical appointments. Finally, evidence of Ju.P.'s nightmares and tantrums following visits with appellant dispels the notion that appellant maintained a meaningful and supportive parental bond with his children. Accordingly, this enumerated error fails as well.
(b) Appellant next alleges that the juvenile court failed to find that the causes of Je.P.'s deprivation are likely to continue or will not likely be remedied, and that clear and convincing evidence does not exist to support the court's findings with regard to Ju.P. We disagree with both contentions. Although the court's findings on this issue mention Ju.P.'s medical needs, the reference to children obviously includes Je.P. as well. Moreover, the evidence clearly supports the court's findings.
*414 Appellant points to testimony in the record that he visited with his children regularly in the five months preceding the hearing and that he passed his last drug screen in February 2003. "While the [father's] efforts to improve [himself] are good, the trial court must determine whether a parent's conduct warrants hope of rehabilitation, not an appellate court."[9] Further, the court is not required to ignore a parent's past conduct in determining whether the conditions causing the children's deprivation are likely to continue.[10] The juvenile court was not required to reunite appellant with his children in order to obtain current evidence of deprivation or neglect.[11]
Appellant's reliance on In the Interest of R.U.[12] in support of his argument that the court erred in terminating his parental rights is misplaced. In R.U., the parents showed steady improvement, accomplished many of the goals in their case plan, received family counseling and psychiatric care, and completed a substance abuse program. The couple's counselor testified that "nothing about the couple would lead him to believe they were incapable of caring for their children."[13] We vacated the termination order for consideration of alternative dispositions. The same circumstances are not present in the case at bar. Although appellant has not tested positive for drug abuse since 2002, he has been unwilling to undergo treatment or to recognize his parental responsibilities. There is evidence that he has never accepted responsibility for the neglect of his children or the abuse of their mother. Significantly, he has utterly failed to demonstrate an ability to cope with his children's medical needs and to provide any financial support. This authorized the court to find by clear and convincing evidence that the deprivation is likely to continue or will not likely be remedied.[14]
(c) Furthermore, clear and convincing evidence showed that continued deprivation was likely to cause serious physical, mental, emotional, or moral harm to the children. In addition to the evidence of appellant's past neglect of the children's medical, physical, and emotional needs, the testimony of their foster mother revealed that current contact with him was upsetting and disruptive to the children. Also, "[t]he juvenile court was authorized to consider the adverse effects of prolonged foster care in determining that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the children."[15] In this case, the older child, Ju.P., had spent all of his life since the age of six months in foster care, and the younger child, Je.P. had spent much of his life in foster care.
2. Finally, the juvenile court was required to consider whether termination was in the best interests of the children. "[A]s with the `harm' factor set forth above, in determining the best interests of the children, a court may consider their need for a stable home environment and the detrimental effects of prolonged foster care."[16] In the case sub judice, testimony was presented that the children had bonded with their foster family, who had provided a nurturing, stable environment for them and who desired to adopt them. In addition, "[t]hose same factors which show the existence of parental misconduct or inability can also support a finding that the termination of parental rights of the defaulting parent would be in the child[ren]'s best interest."[17] Evidence *415 of appellant's lack of financial and proper medical support authorizes the conclusion that termination is in the children's best interests.
3. In his final enumeration of error, appellant contends that DFCS failed to pursue his father, M.P., as a suitable placement. However, M.P. did not testify that he would be willing to assume sole custody of the children. Rather, when questioned about his desire to care for them, M.P. equivocated, stating that "maybe" he and appellant "could have joint custody." This evidence authorized a finding that placement of the children with their paternal grandfather was not a viable alternative.
Judgment affirmed.
BLACKBURN, P.J., and BARNES, J., concur.
NOTES
[1] (Citation omitted.) In the Interest of S.H., 251 Ga.App. 555(1), 553 S.E.2d 849 (2001).
[2] (Citation and punctuation omitted.) In the Interest of C.F., 251 Ga.App. 708, 555 S.E.2d 81 (2001).
[3] OCGA § 15-11-94(b)(4)(A)(i)-(iv).
[4] OCGA § 15-11-94(a). See In the Interest of D.L.D., 248 Ga.App. 149, 152, 546 S.E.2d 11 (2001).
[5] (Citations omitted.) In the Interest of E.C., 225 Ga.App. 12, 15, 482 S.E.2d 522 (1997).
[6] (Citation and punctuation omitted; emphasis in original.) In the Interest of Z.B., 252 Ga.App. 335, 337(1), 556 S.E.2d 234 (2001).
[7] OCGA § 15-11-94(b)(4)(C)(i)-(iii).
[8] In the Interest of T.B., 267 Ga.App. 484, 600 S.E.2d 432 (2004).
[9] (Citations and punctuation omitted.) In the Interest of M.L.P., 236 Ga.App. 504, 509(1)(c), 512 S.E.2d 652 (1999).
[10] In the Interest of H.H., 257 Ga.App. 173, 176(1)(a), 570 S.E.2d 623 (2002).
[11] In the Interest of C.M., 251 Ga.App. 374, 376, 554 S.E.2d 510 (2001).
[12] 223 Ga.App. 440, 477 S.E.2d 864 (1996).
[13] Id. at 441, 477 S.E.2d 864.
[14] See In the Interest of S.E.L., 251 Ga.App. 728, 731(2)(c), 555 S.E.2d 115 (2001); In the Interest of C.W.D., 232 Ga.App. 200, 204(1), 501 S.E.2d 232 (1998).
[15] (Punctuation and footnote omitted.) In the Interest of M.C.L., 251 Ga.App. 132, 136(1)(b), 553 S.E.2d 647 (2001).
[16] (Footnote omitted.) Id. at 136(2), 553 S.E.2d 647.
[17] (Citation and punctuation omitted.) In the Interest of S.E.L., supra at 732(3), 555 S.E.2d 115.